JAMES MERLE ADAMS, APPELLEE, V. AMY SUE ADAMS, NOW KNOWN AS AMY SUE FOX, APPELLANT.

691 N.W.2d 541

Filed January 18, 2005. No. A-04-228.

Terrance A. Poppe and Nick Froeschl, of Morrow, Poppe, Otte, Watermeier & Phillips, P.C., for appellant.

David W. Rowe, of Kinsey, Ridenour, Becker & Kistler, L.L.P., for appellee.

INBODY, Chief Judge, and IRWIN and CARLSON, Judges.

INBODY, Chief Judge.

## INTRODUCTION

Amy Sue Adams, now known as Amy Sue Fox, appeals from the judgment of the Lancaster County District Court denying her petition for modification of child custody. For the reasons set forth herein, we affirm.

## STATEMENT OF FACTS

Amy and James Merle Adams were married on June 9, 1984. Two children were born to them during the course of the marriage: Mandi Adams, born on September 24, 1984, and Whitney Adams, born on May 7, 1987. The parties' marriage was dissolved on February 2, 2000, and the parties agreed at that time that James should have sole physical custody of both daughters, subject to Amy's rights of visitation. The parties agreed to share legal custody, and Amy agreed to pay $50 per month in child support to James.

On March 25, 2002, Amy filed a petition to modify the custody of Whitney. James filed a cross-petition for increased child support on April 5. The matter came on for trial on July 2, but prior to completion of the trial, both parties orally moved to dismiss their respective petitions.

On February 27, 2003, Amy filed another petition to modify Whitney's custody. In her petition, she alleged that James did not adequately provide for Whitney's daily needs and necessities of life, that his lifestyle and living arrangements were not appropriate for Whitney, that Whitney desired to live with Amy, and that it was in the best interests of Whitney to have her custody be awarded to Amy. James again filed a cross-petition for increased child support. Amy filed a motion for temporary custody of

Whitney on August 12, and that motion was denied on August 29. James filed a motion for an order to show cause. The motion alleged that despite the district court's denial of Amy's motion for temporary custody, Amy was "willfully and contumaciously violating the [dissolution] Decree. For weeks, [Amy] has been exercising sole physical custody over . . . Whitney [and] refusing to return sole physical custody to [James]." The motion requested that the court order Amy to "show cause why [Amy] should not be found in contempt" and to comply with the court's denial of her motion for temporary custody. On November 13, Amy was ordered to show cause why she should not be found in contempt, and at a hearing on January 8, 2004, "the parties informed the court that Whitney was spending more time with James." Although it did not do so explicitly, the district court, it appears by implication, declined to find Amy in contempt.

A hearing on Amy's second petition to modify was held on January 14, 2004. Whitney was called as Amy's first witness. She testified that she was in the 11th grade and that she had a "B" average in school. Whitney also testified that she worked 25 to 30 hours per week at a restaurant. Whitney said that she felt that Amy's house was her home, that Amy's house was only four blocks from James' house, and that she preferred to live with Amy. Whitney said that when she stays at James' house,

> I go to sleep anywhere — usually 11:30 when I get home from work and I wake up at 6:00 and I go to [Amy's] because that's where all my stuff is and it is easier that way and I leave for school around 7:15 and I go to school and then I come back home around 2:30 and I go to work at 5:30 and then go back to [James'] at 11:30.

Whitney testified that when she goes to Amy's house after school and spends the afternoon there, she often watches television with Amy. Whitney also testified that Amy is the parent who takes her shopping or to the doctor and that if she needs to discuss personal issues, Amy is the parent in whom she confides.

Whitney further testified that her schedule conflicted with James' schedule so that they did not see each other very often. She said that she is often asleep when James gets home and that she leaves in the morning before James wakes up. She also said that if she eats breakfast, it is at Amy's house, and that she eats

dinner at Amy's house as well. When asked why she thought it would be better if she lived with Amy, Whitney said that Amy is "home when I'm home and it is just — I think it would be a lot easier because me sleeping at [James'] and going to [Amy's], I think it is pointless for me to do that." Whitney also testified that her curfew is the same at both Amy's house and James' house and that she has basically the same chores at each house. Whitney indicated that neither Amy nor James puts restrictions on her visitation time with the other parent.

Whitney next testified that while Amy does not say derogatory things about James, James "[s]ometimes" says derogatory things about Amy. Whitney acknowledged that Amy has had problems with drinking in the past, but asserted that she had not seen Amy or Amy's husband, Bill Fox, drink in nearly 2 years. She said that Amy assisted her financially on occasion and that James did "[n]ot really" help her financially.

On cross-examination, Whitney admitted that at the time of Amy and James' divorce in 2000, Whitney wanted to live with James "because [Amy] was drinking." However, Whitney claimed that her preference changed "[a]fter a couple of months with living with [James]." Whitney testified that as recently as May 2002, Amy was drinking heavily, would black out occasionally, and would argue with Bill. Whitney said that Amy and Bill had been in physical altercations during which Amy was injured. Whitney also testified that Amy went to alcohol abuse treatment in May 2002. Whitney admitted that she had disobeyed the district court's temporary custody order by staying at Amy's house on nights she was to spend at James' house, but she indicated that she would abide by the court's decision regarding Amy's petition. Whitney also admitted that James allowed liberal visitation to Amy. On redirect examination, Whitney testified that she had no concerns about living with Amy and Bill and that if her custody were placed with Amy, she could still see James regularly.

Amy testified that she was 42 years old and that she had been married to Bill for 1½ years. She said that she was employed by Lincoln Public Schools as a cafeteria manager and that she worked from 7 a.m. to 1:15 p.m., Monday through Friday. She testified that she thought it was in Whitney's best interests to live with her because Amy is "home all the time [and Whitney] is a

girl. We understand each other. I feel I can provide a better home for her. I don't think that [James] doesn't love her. I just don't think there is enough time there and I feel she's 16 and needs supervision." Amy admitted that she was an alcoholic, but that she had not used alcohol since April 19, 2002, and that she had been to an alcohol abuse treatment program. When asked how she dealt with her alcoholism, Amy said that she has "a great support system at home. [Bill] is also an alcoholic. He no longer drinks either. We do a lot — a little bit of reading with our AA books and my family."

Amy further testified that Whitney does her homework at Amy's house and that Amy and Whitney discuss Whitney's scholastic decisions together. Amy said that in the afternoons when she spends time with Whitney, they "usually sit and visit for a little bit or watch TV." Amy testified that Whitney generally eats her evening meal at Amy's house and that Amy cooks the evening meal. When asked whether there were additional reasons why she felt it was in Whitney's best interests to live with her, Amy said that "we need closure on this. It's been real hard on her and if her grades have been struggling or maybe not as good as they have been, she's been going through an emotional thing and, um, I feel like I can give her a more stable environment." Amy also said that she would not restrict Whitney's contact with James. Amy testified that Whitney is a mature girl who has given considerable thought to her living arrangements.

On cross-examination, Amy admitted that James allowed Whitney to visit Amy "pretty much whenever she wanted." Amy further admitted that she suffers from obsessive-compulsive disorder and that she takes medication to control it. She said that she had suffered from bulimia in the past, but not in the past 10 years. When asked whether James was "generally a pretty decent father," Amy replied that James "loves his children very much."

James testified that he lived four blocks from Amy and that he worked from 8 a.m. to 5 p.m., Monday through Friday. When asked why he thought it was important that he retain physical custody of Whitney, James replied that he "worr[ied] about Whitney's safety until she's out of high school. I've seen history from [Amy and Bill] showing violence and drinking and other behaviors that Whitney seems to be picking up." James did admit

that he had not witnessed any questionable behavior by Amy or Bill in the past 1½ years, but that he was concerned about the possibility that they could begin drinking again, because he had "seen Amy relapse once already." When asked again for his primary reasons for wanting to maintain physical custody of Whitney, James said that his "main reason is I love [Whitney] very much and I miss her when I don't get to see her. Secondly, I worry about her safety, yes, until she gets out of high school and she's able to be on her own." On cross-examination, James did admit that he is occasionally at his girl friend's house when Whitney gets off work at 11:30 p.m. When asked whether it would "make sense [for him to] be home at 11:30 so [Whitney] doesn't come home to an empty house," James replied that he is "home most of the time. Occasionally, I'm home late but I'm almost always home before midnight, before she is."

At the end of the trial, the district court took the matter under advisement. The court entered its order denying Amy's petition on January 22, 2004. In its order, the district court made numerous findings:

> One of the problems that led to the parties' divorce was Amy's drinking. She admits that she is an alcoholic and has been so since the age of twenty, more than twenty years ago. Following inpatient treatment . . . in 1988, she maintained sobriety until October of 1998. She admits she has passed out from drinking on numerous occasions and has suffered blackouts. The children have witnessed her to black out, the last occasion being during the week of April 10, 2002. Amy again entered[,] in April of 2002[,] inpatient treatment and states that she has not consumed alcohol since that date. There is no evidence to contradict this assertion.

> . . . Amy admits that she and Bill have had numerous arguments, several of which involved screaming and shouting at each other in the presence of Whitney. In April of 2001, one of these arguments resulted in Amy suffering broken ribs and Bill being cited for assault . . . .

> . . . .

> Since the divorce, Whitney has spent a substantial amount of time with Amy and has been encouraged to do so by James. . . . James has never interfered with any visitation

except during the fall of 2003 when Whitney basically moved in with Amy and did not return to James' house, leading to the order to show cause.

. . . .

It is clear that James is not an unfit parent. In fact, both James and Amy agree that neither of them are unfit and Whitney concurs in this. She testified that she loves both her parents, finds little fault with James but prefers to live with [Amy].

There are several factors that are of concern to the court in this case. First, as this court noted in its order of August 29, 2003, the custody of minor children should not be a "continuing running gun battle" between the parents. . . .

A second concern is whether Amy will encourage and foster Whitney's visitation and relationship with James should Amy obtain custody. . . . James has done an exemplary job of doing so, encouraging Whitney to spend a great deal of time with Amy. Conversely, Amy's actions, or inaction, following this court's denial of her motion for temporary custody on August 29, 2003, show that she does not feel she is obligated to follow the orders of the court nor is she obligated to [e]nsure that James have meaningful parenting time with Whitney. . . . Amy's attitude at the hearing appeared to demonstrate that Whitney, the child, and not the parent, was in charge. . . . This court has genuine concerns that if physical custody is placed in Amy, the result will be repeated court hearings to enforce visitation.

The testimony of Amy and Whitney appears to describe their relationship more in the nature of "girlfriends" rather than that of parent and child. Such a relationship is consistent with Amy's desire to convince Whitney that it is more enjoyable to spend time with her rather than the parental figure. . . .

Cases such as this are very difficult, if not impossible for courts to solve. Whitney is a fine young woman. She does very well in school, is well behaved, and expresses affection for both parents. Clearly she desires to reside with [Amy]. However, in reality, other than the desire of Whitney, there has been no change of circumstances. In fact, at the time

Amy filed her first petition to modify custody based on Whitney's desires, Amy was still drinking heavily. As noted above, these matters should not be the source of constant requests to modify custody. This court finds that it is not in Whitney's best interest that custody be changed. However, this court is realistic in recognizing that it is difficult, if not impossible, to constantly regulate the amount of actual time Whitney spends with each parent, particularly if Amy does not take a firmer position in this regard. This is a fact of life when dealing with teenage children. Amy's petition should be denied.

The district court also granted James' cross-petition, ordering Amy to pay an increased amount of child support. Amy has timely appealed to this court.

## ASSIGNMENTS OF ERROR

Amy alleges that the district court abused its discretion when it failed to grant her petition to modify child custody and when it failed to order James to pay child support consistent with the Nebraska Child Support Guidelines.

## STANDARD OF REVIEW

■ Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Heistand v. Heistand*, 267 Neb. 300, 673 N.W.2d 541 (2004).

■ An abuse of discretion occurs when the trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Willcock v. Willcock*, 12 Neb. App. 422, 675 N.W.2d 721 (2004).

## ANALYSIS

*Modification of Custody.*

■ Amy first alleges that the district court abused its discretion when it denied her petition to modify the custody of Whitney. Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child

require such action. *Heistand v. Heistand, supra.* The party seeking modification of child custody bears the burden of showing a change in circumstances. *Id.* A material change in circumstances means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. *Id.*

The Nebraska Supreme Court fully explained, in *Hoschar v. Hoschar*, 220 Neb. 913, 374 N.W.2d 64 (1985), the proper procedure for determining whether or not a child custody order should be modified. *Hoschar* provides that "a decree fixing custody of minor children will not be modified unless there has been a change of circumstances indicating that the person having custody is unfit for that purpose or that the best interests of the children require such action." 220 Neb. at 915, 374 N.W.2d at 66. *Hoschar* then addresses notions of what situations constitute "changed circumstances":

> By this rule we do not mean that every change, no matter how insignificant, justifies a change in custody. Rather, by material change of circumstances we mean that the evidence must show that something has occurred, which if the trial court had been aware of the existence of these circumstances initially, the trial court in the best interests of the children would have granted their custody to the other parent. " 'A decree awarding custody of minor children and fixing child-support payments is not subject to modification in the absence of a material change in circumstances occurring subsequent to the entry of the decree of a nature requiring modification in the best interests of the children.' " *Youngberg v. Youngberg*, 193 Neb. 394, 396, 227 N.W.2d 396, 397 (1975).
>
> We do not mean to say that the paramount question is not the best interests of the children, for, indeed, it is. We do mean to say that in response to a motion to modify a custody decree, before the trial court considers what is in the best interests of the children, the court must first find that there has been a material change of circumstances which occurred after the entry of the earlier order granting custody and which affects the best interests of the children. The burden of showing the existence of that material change of

circumstances affecting the best interests of the children is on the party seeking modification of the custody award. 220 Neb. at 915, 374 N.W.2d at 66.

Thus, according to *Hoschar*, prior to the modification of a child custody order, two steps of proof must be taken by the party seeking the modification. First, the party seeking modification must show a material change in circumstances, occurring after the entry of the previous custody order and affecting the best interests of the child. Next, the party seeking modification must prove that changing the child's custody is in the child's best interests.

As the district court noted in its order, it is clear from the record that James is not an unfit parent. There is no evidence in the record to suggest that James is unfit, and when asked whether James was "a pretty decent father," Amy testified that "he loves his children very much." Whitney's testimony also indicated that James is indeed a fit parent. Although James has not become unfit as a parent, our de novo review of the record does suggest that a material change in circumstances affecting Whitney's best interests has indeed occurred in the instant case. Whitney's relationship with each parent has changed significantly since the entry of the parties' custody agreement, and Amy's behavior has also undergone significant improvements. The original custody determination may have been different had these situations been in place at that time. Taken together, they are enough to constitute a material change in circumstances, and these changed circumstances certainly affect Whitney's best interests. Thus, we must next examine whether Amy has proved that modifying Whitney's custody would be in Whitney's best interests.

In its order denying Amy's petition, the district court specifically found that "other than the desire of Whitney, there has been no change of circumstances. . . . This court finds that it is not in Whitney's best interest that custody be changed." In her brief, Amy asserts that the district court abused its discretion by failing to give adequate consideration to the fact that Whitney's clear preference is to live with Amy. Neb. Rev. Stat. § 42-364(2) (Reissue 1998) provides that

[i]n determining custody arrangements and the time to be spent with each parent, the court shall consider the best

interests of the minor child which shall include, but not be limited to:

. . . .

. . . [t]he desires and wishes of the minor child if of an age of comprehension regardless of chronological age, when such desires and wishes are based on sound reasoning.

Further, the Nebraska Supreme Court has noted that "while the wishes of a child are not controlling in the determination of custody, if a child is of sufficient age and has expressed an intelligent preference, the child's preference is entitled to consideration." *Vogel v. Vogel*, 262 Neb. 1030, 1045, 637 N.W.2d 611, 624 (2002).

Amy asserts that Whitney is a mature, responsible, and intelligent minor child. We agree. However, it appears from her brief that Amy is of the belief not only that the preference of a mature, responsible, intelligent minor child regarding his or her custody should be given consideration, but that it should be controlling. We disagree. The statute clearly provides that the desires of a minor child, when the child is of an age of comprehension and when they are based on sound reasoning, are to be considered. However, the statute also directs courts to consider other factors. Additionally, we are unable to find any authority, either statutory or in the case law, that stands for the proposition that a mature, intelligent minor child's wishes regarding his or her custody must be granted. Rather, as mentioned earlier, when a court considers modifying a child's custody, a material change in circumstances must be proved showing that the custodial parent is unfit or that the best interests of the child require such action; the child's preference is but one factor to consider when making this determination.

■ In determining a child's best interests in custody and visitation matters, factors to be considered include the relationship of the minor child to each parent; the desires and wishes of the minor child; the general health, welfare, and social behavior of the minor child; and credible evidence of abuse. See, § 42-364(2); *Schnell v. Schnell*, 12 Neb. App. 321, 673 N.W.2d 578 (2003). Whitney appears to have a better relationship with Amy than with James, and she clearly prefers to live with Amy. However, the district court's order makes it clear that in its judgment, Whitney's

general health and welfare would be best served by her remaining in James' custody. Amy concedes that she is an alcoholic and that in the recent past, she has gotten intoxicated, blacked out, gotten into arguments, and been physically assaulted by Bill, her current husband. We applaud Amy's considerable efforts to improve her behavior, and it was not an abuse of discretion for the district court to consider them when assessing Whitney's general health and welfare.

Upon our de novo review of the record, we cannot say that the district court abused its discretion in finding that Whitney's interests would be best served by continuing her custody in James. The district court's order is accordingly affirmed.

*Child Support.*

Amy also assigned as error the district court's failure to order James to pay child support consistent with the Nebraska Child Support Guidelines. However, this assignment was contingent on the success of her first assignment of error. Since we determined that the district court did not abuse its discretion when it denied Amy's petition to modify child custody, this assignment of error is moot. Therefore, we decline to address it further.

## CONCLUSION

We find that the district court did not abuse its discretion when it denied Amy's petition to modify child custody. Accordingly, the judgment of the district court is affirmed.

AFFIRMED.