IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

HERBOLSHEIMER V. KOENIG

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

EDITH M. HERBOLSHEIMER, APPELLANT,
V.
CHAD R. KOENIG, APPELLEE.

Filed April 22, 2014.    No. A-13-536.

Appeal from the District Court for Dodge County: GEOFFREY C. HALL, Judge. Affirmed in part, and in part reversed and remanded for further proceedings.

Chinazo Christopher Odigbo for appellant.

Timothy M. Schulz, of Yost, Schafersman, Lamme, Hillis, Mitchell, Schulz & Hartmann, P.C., L.L.O., for appellee.

INBODY, Chief Judge, and MOORE and PIRTLE, Judges.

PIRTLE, Judge.

INTRODUCTION

Edith M. Herbolsheimer (Edith) appeals from an order of the district court for Dodge County which granted the application for modification of child custody filed by Chad R. Koenig (Chad). Edith challenges the change in custody and the court's determination of her child support obligation. We determine that the trial court did not abuse its discretion in finding a material change in circumstances and that the modification was in the best interests of the children. We further determine that the trial court did not have sufficient evidence of the parties' incomes to calculate child support, and we reverse, and remand the child support matter to the trial court for further proceedings. Accordingly, the order of the district court is affirmed in part and in part reversed, and the cause is remanded for further proceedings.

- 1 -

BACKGROUND

Edith and Chad are the parents of two sons: one born in August 2001 and the other born in September 2004. The parties were never married but cohabitated from 2000 to 2008 before separating. On January 29, 2009, a stipulated order was entered granting Edith physical custody of the children, subject to Chad's parenting time, and granting both parties legal custody.

On July 13, 2009, Chad filed an application for modification of custody alleging that a material change in circumstances existed warranting a change in custody. Over the next 3 years, Edith filed or caused to be filed a myriad of motions, contempt applications, protection orders, and reports to Child Protective Services (CPS). The trial court finally entered its order modifying custody on May 23, 2013.

The following sets forth the numerous court hearings and CPS intake reports that occurred between Chad's application for modification and the court's final order.

In May 2010, Edith obtained a protection order against Chad. Chad testified it was based on allegations that he was harassing and threatening her. Edith testified that she sought the protection order against Chad after he was charged on May 8 with third degree assault on JoAnna Lierman (JoAnna), his wife at the time.

On June 24, 2010, the court held Edith in contempt of court for refusing to allow Chad visitation in violation of the stipulated order. Her refusal to allow visitation was based on the assault charge against Chad. The court found that the fact Chad was arrested and charged with assault raised suspicion, but based on the evidence presented at the hearing, did not rise to the level of proof necessary to establish that the children's physical or psychological well-being was in jeopardy.

On October 1, 2010, the court terminated the supervised visitation limitation that had been placed on Chad's visitation as a result of a motion filed by Edith.

On April 12, 2011, following a hearing on another motion to cease/modify Chad's visitation filed by Edith, the court entered an order restoring Chad's visitation rights in their entirety. The court also appointed a guardian ad litem (GAL), Christina Boydston, at this time to represent the children and their best interests.

The trial on Chad's application for modification of custody initially took place on several dates between October 5 and December 1, 2011. The trial was continued, and the next trial dates were July 18, 2012, and February 14, 2013.

During the initial trial dates between October 5 and December 1, 2011, Boydston testified that since being appointed, she had interviewed many people who knew the parties and had reviewed a multitude of documents dating back to the original stipulated order. Based on her research, she had several concerns about Edith.

She testified that she was concerned about Edith's instability in housing. Edith had moved at least six times since 2008 and had discussed moving to Florida on two occasions. Boydston testified that she was concerned that Edith might move to Florida with the children without court approval.

Boydston testified that she was also concerned about the way Edith talked about the custody matter constantly with the children and with everyone else, and talked negatively about Chad in front of the children. Edith indicated to Boydston that the custody matter is a "full-time

job" for her. Boydston described the discussions between Edith and the children as a constant barrage of criticism and manipulation that is not in their best interests.

Boydston also expressed concern about the multiple therapists Edith had taken the children to see. She testified that it is hard for the children to establish a relationship with a therapist if the therapist keeps changing. She also testified that when she spoke with the therapists, it was hard to get objective information because there was very little collateral information outside of information Edith had provided. The therapists had neither spoken to Chad nor observed him with the children.

Boydston also testified that Edith has repeatedly failed to comply with orders of the court and did not believe that was going to change. She testified that Edith does not believe rules apply to her.

Boydston testified about the first time she met with the children at Edith's home. She testified that the older son was very upset and did not want to talk to her, but that the younger son was very personable and easy to talk to. While Boydston was talking to the younger son, Edith interrupted and told him to tell Boydston what he wanted to tell the judge. Boydston testified that he responded very mechanically, "my daddy strangled JoAnna." She testified that his response seemed very rehearsed.

Boydston testified that a short time later, she met with the children individually at their school and the older son's demeanor was completely different than it was at Edith's home. She testified that he was happy and willing to talk to her. He said nothing negative about either parent and had no concerns about Chad, indicating that he loved his father and liked spending time with him. Boydston also testified that she talked to the younger son and that he also had no concerns about Chad.

Boydston also went to Chad's home and visited with him while the children were present. She indicated no concerns with Chad as a result of that visit.

Boydston testified that Edith had indicated that Chad was physically abusive to her during their relationship. She was also aware of allegations that Chad had assaulted the children. She testified that her investigation revealed inconsistencies in Edith's claims of abuse by Chad. Boydston stated that in reviewing records, there was a great deal of story changing in reporting the allegations to different authorities so it was difficult to form an opinion as to what actually occurred. She also testified that her review of reports from doctors and CPS prepared during Edith and Chad's relationship indicated there was no physical abuse in the relationship, just a lot of yelling. It was not until after the relationship between Edith and Chad ended that Edith began making reports to therapists and doctors that there was physical abuse.

Chad testified that there is a difficult, hostile relationship between Edith and him. He testified that he was aware that Edith claims that he was abusive to her, and he denied that he was. He also testified that his ex-wife, JoAnna, claims he was abusive, which he denied. Chad gave his account of the incident that led to the third degree assault charge against him. He testified that he and JoAnna had been arguing and that they subsequently both went outside and were doing separate activities. The younger son was also outside at the time, and Chad believed that JoAnna was going to hit the younger son for something he had just done. Chad confronted JoAnna, and she swung a brick at him. He then called the police and "held her at bay" until the police arrived. Chad testified that when the police arrived, JoAnna reported that Chad threw her

on the ground. Chad testified that he was convicted of assault and that his sentence was a $500 fine. Chad also denied any physical abuse to the children.

JoAnna also testified about the incident that led to Chad's conviction for assault, stating that Chad picked her up by the throat and threw her. She testified that this was not the only instance of assault by Chad. JoAnna testified that she is afraid of both Chad and Edith. She is afraid of Edith because Edith has reported her to CPS two or three times in regard to her own children.

Despite her allegations of abuse against Chad, JoAnna testified that during the short time she was married to Chad, he was a good father to the children.

Edith testified that Chad was physically abusive to her during their relationship and that he has been mentally and verbally abusive to her since the stipulated order was entered in January 2009. Despite the allegations Edith made against Chad, she testified that she still wanted him to have regular contact with the children and have a loving, caring relationship with them.

In regard to her income at the time of trial, Edith testified that she was working for a medical center as a medical technician on an "as-needed basis," earning $14.65 per hour. She testified that she has been working an average of 32 hours per week. She testified that she had also recently started a part-time job at a hospital, where she was working an average of 20 hours per week.

On January 9, 2012, the trial court entered a temporary order in regard to Chad's application for modification of custody. The court ordered that physical custody would continue with Edith, subject to certain visitation modifications until the final order of the court was entered. The court stated it was concerned about the mental well-being of the children based on "the ongoing, never-ending psychological warfare between the parties." It further stated that "[t]he volatile, obsessive, irrational, self-serving, controlling, and manipulative conduct of [Edith] and the anger issues of [Chad] are of chief concern of the Court as it relates to [the children]."

The court's January 9, 2012, temporary order ordered Edith to undergo therapeutic counseling in an attempt to alleviate the "ongoing mental abuse/turmoil that [she] has forced upon her children." The court ordered Chad to undergo anger management counseling to deal with his anger issues that occur when he is placed in stressful situations, particularly when he is involved in a domestic relationship. In addition, the court ordered Chad and his girlfriend, with whom he was living, to go to therapeutic counseling.

On March 8, 2012, a hearing was held on a motion to cease/modify visitation filed by Edith. Edith filed the motion after she took the older son to a hospital emergency room following a visit with Chad because the older son was complaining of pain and told her that Chad threw him. Following the hearing, the court denied the motion, finding it frivolous, and ordered that Chad was to have visitation that same day.

After the conclusion of another hearing in March 2012, Edith filed a police report against the guardian ad litem, Boydston, alleging that Boydston assaulted her in the hallway outside the courtroom by spitting on her. Edith's allegation was determined to be unfounded, and no charges were filed against Boydston.

On May 2, 2012, Edith filed a petition and affidavit to obtain a domestic abuse protection order against Chad, alleging abuse against the children. An ex parte protection order was issued

preventing him from having any contact with Edith or the children. Chad contested the order, and following a hearing, the protection order against Chad was dismissed.

A continuation of the trial on Chad's complaint to modify custody was held on July 18, 2012. Jason Workman, a child and family services specialist with the Nebraska Department of Health and Human Services (Department), testified. He testified that he conducted an investigation concerning allegations of abuse by Chad against the children and generated a report based on his investigation. The report was received into evidence.

Workman testified that CPS received intake reports of child abuse by Chad on February 27 and March 1 and 7, 2012, and that he received an "emergency contact" from Edith on March 8.

Workman indicated that this was an unusual case because there were a lot of allegations and a lot of variations in the allegations that were being presented to him. In regard to the three intake reports, they all involved the same incident--the older son's complaining of ankle and shoulder pain after coming home from a visit with Chad, initially reporting that Chad picked him up and threw him. Edith took him to the emergency room to be examined on February 27, 2012, took him in for an x ray of his ankle on March 1, and asked the school nurse's aide for an icepack on March 7.

Workman concluded that based on collateral information he obtained from medical professionals and the fact that the older son gave different accounts about the incident to him and medical professionals, the allegations were unfounded.

Workman further testified that Edith contacted him on March 8, 2012, after the hearing that was held that day in which the trial court ordered that Chad be given visitation that same day. Edith called Workman, informing him that the court had ordered a visit with Chad, but that the older son was scared to go. Workman testified that he eventually went to Edith's home, where he spoke with both children. The older son told Workman that Chad had hit him and threw him in his bedroom, and the younger son alleged that Chad had hit him with a belt. Workman testified that the children's behaviors and answers to his questions were "very unusual" and that it seemed the answers were coached or rehearsed. He testified that their statements were "very matter of fact, flat affect, not exhibiting any fear. There [were] no tears. There was no descriptive [sic] of, oh, my gosh, you can't sent [sic] us back into that home. It was just very flat."

Workman testified that during a subsequent interview with the older son, he admitted to Workman that he had not been abused by Chad as he had alleged. The younger son also stated that Chad does not hit him with a belt. Both children also indicated that they felt safe with their father.

Workman concluded in his report that the case should be closed because the allegations were unfounded. The report states that "it appears [Edith] is using every avenue [at] her disposal [sic] discredit [Chad]." Workman's report concludes, in part:

There is no evidence to support that there is abuse physically going on in the family home of the Koenig household. Also there are numerous inconsistent stories coming from [Edith] in terms of what she believes to be evidence of abuse or neglect. These are not consistent with collateral contacts that are involving professional, formal supports and informal being family and relatives. The children have changed their stories[.] [I]t

appears that [Edith] may have coached and rehearsed the story to the boys; the boys have changed or recant[ed] being comfortable with [Chad] and not being fearful.

Workman also testified that Edith contacted his supervisor and requested that he be fired based on his investigation. Workman further testified that Edith accused him of following her. Workman explained that Edith made this allegation after he was shopping at a grocery store and saw Edith and the children in the store's parking lot and in the store. The next day, Edith sent him an e-mail accusing him of following her in public. Workman testified that it was simply a coincidence that they were shopping at the same grocery store.

Workman testified that he was aware of one other report of child abuse or neglect against Chad after his investigation ended, which was also determined to be unfounded.

Boydston also testified, reporting on the parties' compliance with the January 2012 temporary order. As previously stated, the court had ordered Edith to attend therapeutic counseling with the children. Boydston testified that she spoke with the therapist and the children had been attending fairly consistently, but that the therapist had not yet incorporated Edith into the therapy sessions through no fault of Edith's.

The court's January 2012 order had also ordered Chad to undergo anger management counseling and to engage in therapeutic counseling with his girlfriend. Boydston testified that Chad was participating in both types of counseling and that both were going well.

Boydston testified that she was still concerned about Edith possibly moving to Florida because she and her fiance had sold the house they were living in and were living with the fiance's parents. She also testified that her other concerns about Edith as stated in previous testimony remained the same. These concerns included the level of communication and discussion that Edith has with the children regarding the custody matter, and her history of failing to follow court orders and doing what she wants.

Following the evidence presented on July 18, 2012, the trial court entered a temporary order on August 10, granting Chad physical and legal custody of the children. In its order, the court noted:

> The Court continues to be extremely concerned about the well-being of the two minor children due to the ongoing conduct of [Edith]. The evidence presented at the recent hearing further illustrates that [Edith] has continued to subject the children to manipulation, mental anguish and emotional trauma. This Court believes that the children's acting-out conduct is most likely caused by the unstable, chaotic and narcissistically dramatic way [Edith] lives her life and the ongoing manner by which she subjects the children to behavior and conduct that this Court fears borders on mental and emotional abuse.

The trial court also ordered Edith to pay temporary child support in the amount of $668 per month.

The final trial date on Chad's application for modification of custody occurred on February 14, 2013. Workman testified that in October 2012, CPS received three intake reports of child abuse and/or neglect against Chad. All three reports related to Chad's failing to provide the children with their medication. Workman testified that the Department determined that no investigation was warranted on any of the intakes and that it took no action.

Boydston testified as to how the children were doing in Chad's temporary custody. Boydston testified that the younger son is doing well in school and seems happy. She testified that the older son is doing well behaviorally in school and is not exhibiting the odd behaviors that he was at his former school. Boydston reported that the older son does not want to study or do his homework, which is hurting his grades, but that the school was working with the parents and the therapist in finding a way to solve the problem. Boydston also testified that Chad was taking the children to therapy on a regular basis and that the therapy was going well.

Edith testified that she called CPS on October 2, 2012, to report that Chad was not giving the children their asthma medication. She testified that she made the report after she had the children for visitation, their breathing became difficult, and she had to take them to the doctor. She testified that after the doctor visit, Chad contacted her by text message, telling her that she had no right to take the children to the doctor. Edith testified that the text message was in all capital letters, which she perceived as Chad yelling at her. She testified that because of the text message, she feared for her safety and called the police to be present at the exchange of the children.

Edith also testified about her employment at the time. She testified that she had been working for a counseling service since October 2012. She testified that her hourly rate of pay there varies depending on what work she is doing. She testified that she works on an "as-needed" basis and is not scheduled for specific hours. Edith testified that in January 2013, she had also started working for an airline where she works 17.9 hours per week, earning $10.85 per hour.

At the end of trial on February 14, 2013, the court asked both parties to submit W-2's for 2012 and pay stubs for 2013 by March 8. There is nothing in the record to indicate the parties did so.

The trial court subsequently entered an order granting Chad's application for modification of custody, finding that there was a material change in circumstances regarding the ongoing safety, welfare, and best interests of the children. The court stated:

> [The court] continues to be very concerned about the conduct of [Edith] as it relates to the minor children. The instability and emotional trauma brought by her into the family dynamic continues to exist. . . . [T]he Court finds it is extremely clear that the most stable and best environment for the minor children is with [Chad].

The trial court also ordered Edith to pay $643 per month in child support.

## ASSIGNMENTS OF ERROR

Edith assigns that the trial court erred in (1) finding that a material change in circumstances existed to warrant a modification in custody, (2) finding that it is in the best interests of the children to be placed in Chad's custody, (3) awarding Chad custody despite his conviction for domestic violence, and (4) ordering her to pay an unreasonable amount of child support.

Chad also sets forth assignments of error in his brief; however, we do not reach them because he did not file a brief for cross-appeal in accordance with the requirements of Neb. Ct. R. App. P. § 2-109(D) (rev. 2012). A party filing a cross-appeal must set forth a separate division of the brief prepared in the same manner and under the same rules as the brief of appellant. *Vokel v. Nebraska Acct. & Disclosure Comm.*, 276 Neb. 988, 759 N.W.2d 75 (2009). Thus, the

cross-appeal section must set forth a separate title page, a table of contents, a statement of the case, assigned errors, propositions of law, and a statement of facts. *Id.* Chad's brief does not include these requirements for a cross-appeal. Also, the cross-appeal was not noted on the cover of the brief, as is required by § 2-109(D)(4). Therefore, we do not consider the merits of the purported cross-appeal.

## STANDARD OF REVIEW

Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Watkins v. Watkins*, 285 Neb. 693, 829 N.W.2d 643 (2013). An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action. *Id*.

On appeal of a trial court order determining child custody, when the evidence is in conflict, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012).

An appellate court reviews child support cases de novo on the record and will affirm the trial court's decision in the absence of an abuse of discretion. *Hill v. Hill*, 20 Neb. App. 528, 827 N.W.2d 304 (2013).

## ANALYSIS

*Modification of Child Custody.*

Edith argues that the trial court erred in finding that a material change in circumstances existed to warrant a modification in custody and in finding that it was in the best interests of the children to be placed in Chad's custody.

Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action. *Heistand v. Heistand*, 267 Neb. 300, 673 N.W.2d 541 (2004). The party seeking modification of child custody bears the burden of showing a change in circumstances. *Adams v. Adams*, 13 Neb. App. 276, 691 N.W.2d 541 (2005). A material change in circumstances means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. *Heistand v. Heistand, supra.*

Prior to modification of a child custody order, two steps of proof must be taken by the party seeking modification. *Adams v. Adams, supra.* First, the party seeking modification must show a material change in circumstances, occurring after the entry of the previous custody order and affecting the best interests of the children. *Id.* Next, the party seeking modification must prove that changing the custody is in the children's best interests. *Id.*

- 8 -

We conclude that Chad has met his burden to prove that a material change in circumstances has occurred since the entry of the stipulated order in January 2009. Since the entry of that order, Edith has engaged in a widespread and extensive effort to tarnish Chad's character in an effort to maintain custody of the children.

She has made or has caused to be made numerous reports to CPS alleging child abuse or neglect by Chad. All of the reports to CPS were determined to be unfounded or were not even investigated.

Workman performed a thorough investigation of the entire family based on reports to CPS and an "emergency contact" by Edith in February and March 2012, and he concluded that there was no merit to the allegations. His report also outlined the manipulative and irrational behavior by Edith in attempting to maintain custody and discredit Chad as a father. When she did not like the results of Workman's investigation, she contacted his supervisor and requested that he be fired. She also accused Workman of following her in public.

Workman also testified about other intake reports to CPS in October 2012, all relating to Chad failing to provide the children with their medication. The Department determined that no investigation was necessary and took no action in regard to the intake reports.

In addition to the reports to CPS, Edith was held in contempt of court for refusing to allow Chad visitation, she has filed motions to cease or limit Chad's visitation, and she has filed two protection orders against Chad, one of which was in place for a year and the other was dismissed following a hearing.

Boydston expressed several concerns about Edith, namely her instability in housing, the multiple therapists she took the children to, her failure to comply with court orders, and the level of communication and discussion that she has with the children about the custody matter. Boydston and Workman also both testified that the children's answers to certain questions about Chad seemed coached or rehearsed. Boydston further testified that Edith filed a police report against her, claiming that Boydston had assaulted her after a court hearing. The report was determined to be unfounded.

As a result of Edith's continual attempts to damage Chad's character, she has interfered with his relationship with the children and subjected the children to emotional trauma and manipulation.

In regard to Chad, there was evidence that he has anger issues, particularly in regard to domestic relationships, and has a conviction for third degree assault. However, he had no prior convictions and no convictions after the conviction in 2010. Also, in January 2012, the court ordered him to undergo anger management counseling and to engage in therapeutic counseling with his girlfriend. Boydston testified in July 2012 that Chad was participating in both types of counseling and both were going well.

On appeal of a trial court order determining child custody, when the evidence is in conflict, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012).

Based on our de novo review of the record in this case, and taking into consideration and giving weight to the trial court's acceptance of Chad's version of the facts, we conclude that

Chad has met his burden to prove a material change in circumstances since the entry of the stipulated order in January 2009.

Having found a material change in circumstances to exist, we must also determine whether it is in the children's best interests to be placed in Chad's custody. The best interests of a child require a parenting arrangement which provides for a child's safety, emotional growth, health, stability, and physical care and regular and continuous school attendance and progress. Neb. Rev. Stat. § 43-2923(1) (Cum. Supp. 2012); *Donscheski v. Donscheski*, 17 Neb. App. 807, 771 N.W.2d 213 (2009). When deciding custody issues, the court's paramount concern is the child's best interests. *Citta v. Facka, supra.*

While the evidence was conflicting, it seems clear that it is in the best interests of these children to be in Chad's custody. Following the court's temporary order giving Chad custody, Boydston testified in February 2013 that the children were doing well in his care and were getting settled into a routine. She testified that the children seemed to have adjusted to their new school and that they had made friends. The younger son was doing well in school and seemed happy. The older son's behavior in school was good, but he was resisting studying and doing homework, which was affecting his grades. However, the school was working with both parents and his therapist to find a solution. Boydston also testified that Chad was taking the children to therapy on a regular basis and that the therapy was going well.

Boydston testified that the children's lives seem calmer in Chad's care. She testified that the children were under pressure regarding the custody matter when they were in Edith's care and that it was something they were dealing with on a daily basis. She testified that there have not been any reports to CPS or the Department since October 2012 and that the chaos in the children's lives seemed to have settled down.

Chad's home appears to provide a better environment for the children, particularly with respect to their emotional growth, stability, and school progress. Therefore, we find that the trial court did not abuse its discretion in concluding that it was in the children's best interests to be placed in Chad's custody.

*Chad's Assault Conviction.*

Edith also assigns that the trial court erred in awarding Chad custody, because of his conviction for domestic assault. Relying on Neb. Rev. Stat. § 43-2932 (Reissue 2008), Edith argues that based on Chad's conviction, the court was required to make certain written findings before it could award Chad custody, which it failed to do. Section 43-2932(3) provides that if a parent is found to have committed domestic intimate partner abuse, "the court shall not order legal or physical custody to be given to that parent without making special written findings that the child and other parent can be adequately protected from harm by such limits as it may impose under such subsection."

While it is true that Chad was convicted of third degree assault, the conviction was the result of an incident with JoAnna, whom Chad was married to at the time. The incident did not involve Edith. The statute refers to protecting "the child and other parent" when a parent has engaged in domestic abuse. Accordingly, we conclude that the statute applies to instances where domestic abuse occurred between the parents of the children at issue, where it is necessary to ensure that there is no future domestic abuse to the "other parent." If there has been no domestic

intimate partner abuse between the parents, there is no reason to protect the child or the other parent.

In the present case, the domestic abuse was between Chad and a third party. Although Edith made numerous allegations of abuse by Chad against herself, there was no finding by the court that such abuse occurred. Accordingly, § 43-2932 is inapplicable and it was not necessary for the court to make special written findings pursuant to the statute before awarding Chad custody. This assignment of error is without merit.

*Child Support.*

Edith also argues that the trial court erred in the amount of child support it ordered her to pay. The court ordered her to pay $643 per month. Edith contends that the trial court failed to use her income from 2012 to calculate child support, which would have resulted in a child support obligation of $335 per month.

During the trial dates in 2011, Edith testified that she was working for a medical center as a medical technician on an "as-needed basis," earning $14.65 per hour. She testified that she had been working an average of 32 hours per week. She testified that she had also recently started a part-time job at a hospital, where she was working an average of 20 hours per week.

On the last day of trial, February 14, 2013, Edith testified that she had been working for a counseling service since October 2012. She testified that her hourly rate of pay at the counseling service varied depending on what work she is doing. She testified that she worked on an "as-needed" basis and is not scheduled for specific hours. Edith testified that in January 2013, she also started working for an airline where she works 17.9 hours per week, earning $10.85 per hour.

At the end of trial on February 14, 2013, the trial court asked both parties to submit current income information, specifically 2012 W-2 wage and tax statements and pay stubs from 2013. The parties were given until March 8 to submit the requested information. There is nothing in the record to indicate that the parties provided this information to the court by that date.

However, Edith's 2012 W-2's were presented to the court at a hearing in April 2013, in regard to a motion for modification of child support filed by Edith. Although the motion is not in the record before us, based on the hearing date, we know that the motion was filed prior to the court's entering its order of modification on May 23. It appears that Edith filed the motion in response to a document entitled "Order" filed by the court on March 29 setting forth its findings in regard to Chad's application to modify child custody. The "Order" directed Chad's counsel to prepare a modified decree and a modified parenting plan that comported with the court's decision and to send both to Edith's counsel for approval as to form and content prior to submission to the court for its signature. We determined that the March 29 "Order" was not a final, appealable order. See *Wagner v. Wagner*, 275 Neb. 693, 749 N.W.2d 137 (2008) (court's direction to counsel to prepare final decree, and submit that decree for approval to opposing counsel and then court, clearly indicates that letter was not intended to be court's final adjudication of rights and liabilities of parties).

As the Supreme Court stated:

> Because of the potential for confusion, trial courts should be very careful if they decide to inform the parties of their findings before entering a final judgment. In

particular, trial courts, and the clerks of those courts, should not file stamp any court-issued document that is not meant to take legal effect. Instead, "the trial court should notify the parties of its findings and intentions as to the matter before the court by an appropriate method of communication" without file stamping any document. And only the signed final order should be filed with the clerk of the court.

*Wagner v. Wagner*, 275 Neb. 693, 700-01, 749 N.W.2d 137, 143.

The trial court's May 23, 2013, order of modification was the final, appealable order in the present case. Therefore, when Edith presented evidence of her 2012 income in support of her motion, she was trying to modify an order that had not yet been entered. The trial court denied Edith's motion, finding in part that "if [Edith's] Motion is deemed to be a request for a new trial, then it is untimely filed, and as such, it cannot stand under Nebraska law."

We agree that Edith's motion for modification of child support was premature, or "untimely" as the trial court referred to it. Accordingly, any evidence of her income presented at the hearing on her motion was not properly before the court and should not have been considered by the court in determining her child support obligation.

However, even if Edith's evidence of her income from 2012 could be considered, the trial court did not have sufficient evidence of either party's income to calculate child support. Pursuant to the Nebraska Child Support Guidelines, the trial court needed current income information from both parties, preferably copies of at least 2 years' tax returns, financial statements, and current wage stubs. See Neb. Ct. R. § 4-204. There is no evidence of Chad's current income. Thus, we reverse the trial court's child support determination and remand the child support matter to the trial court for further proceedings to determine the income of both parties and calculate child support based on those figures.

## CONCLUSION

After our de novo review of the record, we conclude that the trial court did not abuse its discretion in granting Chad's application for modification of custody. We further conclude that the trial court did not have sufficient evidence of the parties' income to calculate child support, and we reverse the trial court's child support order and remand the cause for further proceedings.

AFFIRMED IN PART, AND IN PART REVERSED AND
REMANDED FOR FURTHER PROCEEDINGS.