IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

ARMITAGE V. ARMITAGE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

RONNY L. ARMITAGE, APPELLEE,

V.

LORI R. ARMITAGE, APPELLANT, AND STATE OF NEBRASKA, INTERVENOR-APPELLEE.

Filed November 15, 2016.    No. A-16-281.

Appeal from the District Court for Madison County: MARK A. JOHNSON, Judge. Affirmed.

Melissa A. Wentling for appellant.

Patricia M. Samuels, of Copple, Rockey, McKeever & Schlecht, P.C., L.L.O., for appellee.

INBODY, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

INTRODUCTION

Ronny L. Armitage and Lori R. Armitage were divorced in 2011; their divorce decree provided for joint legal custody of their two sons, with physical custody awarded to Lori. On February 17, 2016, the district court for Madison County modified the decree by awarding physical custody of the children to Ronny, with Lori receiving parenting time on alternating weekends. Lori appeals; finding no abuse of discretion, we affirm.

BACKGROUND

Ronny and Lori were divorced on April 5, 2011. They were awarded joint legal custody, with Lori granted physical custody, of their two minor children, Chrystian (born in 2000) and Cameron (born in 2003). Ronny was awarded parenting time every other weekend.

In response to the State filing an action seeking to increase Ronny's child support obligation, Ronny filed an "Amended Answer and Cross Complaint" on July 13, 2015, seeking

- 1 -

physical custody of both Chrystian and Cameron. He alleged a material change in circumstances based upon the boys' expressed desire to live with him instead of Lori. The State's child support action was resolved by agreement; Ronny's action for a change of physical custody proceeded to trial on January 21, 2016. Ronny and Lori each verbally acknowledged to the judge at the commencement of trial that the children could testify in the courtroom, one at a time, without the presence of either parent or any other person except the attorneys. It was agreed the court would ask questions and have a dialog with the children, and then the attorneys would have an opportunity to ask questions.

Chrystian testified first; he was 15 years old and attended Norfolk Senior High School. He agreed that he had expressed a desire to live with his father. At his father's, Chrystian can "go into the garage and do something I want to do, like what I want to do when I get older, I want to try to be a mechanic like my dad." Chrystian can sit in the garage and learn, and he "just feel[s] safer there." At his mother's, he comes home and does the same thing every day and there is nothing he can do there to help him learn.

Chrystian did not "feel as safe" at his mother's house. Lori's relatives, "ever since this has been going on, they've been pressuring me, making me feel uncomfortable, and it's been really hard." As an example, Chrystian described how he would be conversing with an uncle about the future and say how it "would be nice if we had this one day," and his uncle would respond, "too bad you're going to be living with your dad." This would make Chrystian "feel really bad." And upon his return from his father's house, the first thing his mother wanted to know was what he did that weekend. And if the boys did not want to talk to her, she would get "really angry" and go down to Chrystian's room and sit on his bed and not leave. Chrystian would explain to her that his father never does that, even though his father does not get to see them for two weeks. Chrystian says his mother always gets mad and then she complains about not getting enough money.

Both parents talked about money matters, and if their father bought something for them, their mother "will be mad that dad bought us it." As an example, Chrystian talked about Cameron going to their father's "with these old rickety shoes, they were torn up and everything," and Cameron said he wanted new shoes but "mom won't buy him shoes." When they returned to their mother's with Cameron's new shoes, "she threw a big fit about how, why did dad buy you those and how come he's the favorite one."

Chrystian said his mother has "changed a lot." He gave as an example how he "was screwing around on a dirt road when [he] shouldn't have been and [he] rolled" his truck coming from school. When the ambulance arrived, his mother told him he did not need to go to the hospital "but she seemed really weird, she seemed like she cared way too much. Like if she wasn't around people, I don't think she would have cared that much." He proceeded to describe a time he fell down the stairs at her house and felt like he broke his ankle. He yelled for her and she looked over at him and asked if he was hurting. He responded that he thought he needed to go see a doctor, and she said they would go in the morning. He told her "my leg really hurts," and "she just started laughing at me, and I thought that was really rude." He pulled a tendon or something in his ankle and "was in this little boot thing for a week. But I just can't forget that day now, that she laughed at me."

Chrystian also talked about how his back had been hurting for a couple years, "and since this court thing came up, she's been trying to butter me up, and she took me to the doctor[']s" for an x ray. Chrystian will not let his father take him to the doctor "because she'll throw a fit." And "there's like a whole different side of her that comes out when I start talking about what we did over the weekend, like we did this with dad, we did that, or Nicole cooked us supper, that really, oh, she don't like that." One night Chrystian was "really mad" and his mother told him to "pack his stuff and leave." He talked about how he and Cameron and their mother got into an argument following the time Chrystian rolled his truck. Cameron had made a sign that said "rest in peace 1994 Ford Ranger," and their mother did not like that. She said she was going to take it down and she left. Cameron and Chrystian were "ticked off," so they headed towards the location of the sign but decided to call their father to pick them up. Their mother did not call looking for them that evening; Chrystian said, "wouldn't you call if you get home at night and your boys aren't home, wouldn't you call right then instead of eight o'clock the next morning?" Chrystian did acknowledge that he did not call his mother, that he and Cameron "were mad at her, but that would have been the right thing to do, to call her."

Chrystian's room is in the basement at his mother's house; Cameron's room is across the hall. Chrystian took the bus to and from school. When asked to describe his routine at his mother's house during the week, Chrystian said he heads upstairs, gets everything ready, and then waits for the bus. His mother "sometimes makes me breakfast when I ask," but he usually did not eat breakfast. Medication that Chrystian had been taking for a couple of years made him not hungry, so he would often not eat at all during the day. When Chrystian would get home from school around 4:00 p.m., he would go down to his room and watch television or play games. Chrystian said he is not old enough for the games he plays (e.g. Call of Duty, Grand Theft Auto), so he has his mother buy them. "They're not really something I should be playing, but I play them because I got nothing else to do." When his mother comes home, "she makes supper and then she hollers" and they go upstairs. For the "past year she's been talking about court, that's all we talk about at dinner." Chrystian takes his food and goes back to his room because he knows that is what she wants to talk about, and "every time we talk about it, it puts me in a horrible mood." His mother will later go down to his room and sit on his bed and talk about it, and when he will not answer her, she leaves. As for weekends, he watches television; "I'm in my room because I have nothing else to do."

Although Chrystian was taking the bus to and from school, his father bought a truck, "the exact same truck as my old one that I rolled," but it had a couple problems. He and his father "took the parts off the old one and put it on the new one and then it was good to go," but he cannot drive it yet because it has no insurance. Prior to his father replacing his truck, Chrystian said his mother did not want to buy another one, but then said she did, and she told him that "if you would just quit this court thing, then I would be able to buy you a truck." When he told her no, she said, "Well, you're not getting a truck then."

Chrystian also described how his mother recently bought Cameron a brand new queen-sized bed, and that Cameron got a smart phone when he was in fifth or sixth grade and when "it got ran over by a pay loader," his mother gave Cameron her old smart phone which Cameron did not like, so their uncle gave Cameron a phone and Chrystian still has his "old junky one." His

mother told him she will not buy him another one because "we're going to wait until court, and she just throws that in my face every time I want something. And Cameron will get what he wants because she thinks he wants to stay with [her]." Chrystian talked about his chores at his mother's house and how he thought it was unfair Cameron did not have to do any chores.

Chrystian talked about how his brother was "not typical." He said, "I grew up and if I cussed I got whipped. He cusses every day. I don't understand how she used to be a parent that if you cussed you usually got soap, now he don't get it, and I remember it, it was a bar soap, she'd scrape it on your teeth and it was not right, but you learned after that." Chrystian believed that "the baby of the family gets what he wants."

Chrystian said Lori's boyfriend, Bill, was "nice" and "very smart," but that "it's kind of weird how I don't know that he's in the house, and she likes to keep him a secret. I don't know, there's something not right." Chrystian did not have any trouble with Bill other than "he's just kind of creepy to me . . . well, I just don't know when he's there." Bill is there "early morning," and although he does not see him, he knows he is there because Cameron's room is apparently below the upstairs bedroom and Cameron "can hear stuff up there," and when they go to the kitchen where his mother makes toast for Bill, Chrystian can hear them. On the weekends, Bill is usually there during the day.

Chrystian said that Ronny's girlfriend, Nicole, and her two daughters live with Ronny. Nicole's younger daughter is younger than Cameron, and the older daughter is always at work and comes home now and then. Chrystian says they are "really nice girls, they're not mean," but that Cameron thinks they are annoying. When Cameron says "he thinks a younger sister would be horrible," Chrystian thinks, "what do you think a younger brother is like?" Christian says he gets along "[p]retty good" with Nicole, and that she is "like another mom to me." He explained that she is "really nice" and she "kind of cares." For example, when he rolled his truck, "[Nicole] told me, 'I'd rather see a hundred trucks rolled than have you hurt' because a truck is replaceable, I'm not. That's what my dad told me."

On Friday nights at his father's house, they usually watch movies or play board games. On Saturday morning, his father will wake him up, sometimes tickling his feet which Chrystian says "makes me mad," but he will get up and Nicole has made cinnamon rolls which he really likes, and that is how the day starts. They talk about what they are going to do for the day, and if they are not going to do much, Chrystian and Cameron will ride around town with the four-wheeler or his go-cart or his new motorcycle. Chrystian will go see what his father is doing in the garage, "and if he's working on something, I'll usually stay there and help him because I think that's really fun." On Sunday mornings, Nicole will cook in the morning and they discuss what they are doing for the day. He and Cameron will ride four-wheelers, or recently they had to take their deer to the guy who was going to de-bone them. "Cameron is really interested in that kind of stuff." Chrystian said that "there's never a day where there's nothing to do," that he likes that, and he does not "have to worry about them sitting me down and talking to me about court like my mother does."

During summer vacation, Chrystian said he goes to visit his "big brother" who lives with a family over by Butte in Atkinson, Nebraska. And while there, Chrystian works driving the tractor, fixing fence, and "it's really fun there because I can get away from everything down here, and it's like a time to relax." Cameron also testified about working for this family in the summer

and just "helping them out around the farm." Cameron also liked being there; he said, "It's fun[,]" and "[i]t's the highlight of the summer."

Chrystian said the best thing about living with his mother is "I got a TV and I can watch TV." His least favorite thing there is "[t]hat it's boring." Chrystian said his mother tries to make it exciting, so she will get a movie, but then she will talk about court when watching the movie. The best thing about being with his father is working on vehicles in the garage. "I love doing that, it's really fun." His least favorite is when something breaks and they cannot go to town to get parts right away, and then he stated, "There's not really anything I don't like."

Cameron, age 12, was in the seventh grade at Norfolk Junior High School at the time of trial. In response to where he would like to live, Cameron said, "I would like to do half and half." Cameron liked living at both places.

Cameron testified that he usually arrived home from school around 4:00 p.m. and either played videogames in his room, played with his cats, or watched television until his mother returned from work. When Cameron heard his mother arrive home, he would go upstairs and usually watch her cook dinner. After dinner, Cameron said everyone takes their shower and then "we'll go down to our bedroom" and watch YouTube and fall asleep. Cameron has a 32-inch flat screen connected to Direct TV. Cameron can have friends over when he wants and "mom knows all my friends." Cameron's favorite thing about living with his mother is "[p]robably we got Xbox One and TV and everything, and we got our cats over there." When asked about his least favorite thing, he said, "I really haven't thought of this one[,]" and then said, "Chores, maybe." He said he takes out the trash and Chrystian cleans out the litter box.

When Cameron was asked whether he talked with either parent about what was going on in court, he said, "Not very often. Usually with my mom." Cameron says he is "all right" talking about it. When asked if he talked "about that sort of stuff with your dad," Cameron said no, and explained, "We're usually out in the garage working on cars or working on our four-wheelers or something."

At his father's house, Cameron said Nicole rents movies on Friday nights. He likes Nicole and her daughters are "[a]ll right[,]" although he added, "One's a little talkative." He said he and Chrystian have separate rooms in the basement at their father's, and that his water bed is "awesome." In the morning, Cameron will "wake up and smell cinnamon rolls," and then go back to bed until his father comes down and gets him up. They will usually work on a car in the garage, or play board games, and on Sunday they go to town and shop or work on a car.

Cameron's favorite thing to do at his father's was having their "four-wheelers and everything over there." His least favorite thing was working on cars; "I like working on four-wheelers better than cars."

Cameron said "[y]eah" when asked if he got along well with both parents, and whether he would be comfortable talking to both of them if he had any concerns. When asked if there was one he would feel more comfortable talking to than the other, he replied, "Maybe my mom since I've lived with her longer."

Cameron wants equal time with his parents, explaining "it's equal so you don't have nothing to fight over or nothing, you have equal time." Cameron said he gets along with Chrystian sometimes, but not "[i]f there's any, like, he takes my food or something[.]"

No other witness testimony was offered; the attorneys indicated at the close of evidence that this was by stipulation of the parties. Each party's child support calculation was also received as evidence.

The district court entered a "Modification of Decree" on February 17, 2016. In that order, the court stated that the children testified, and other than evidence pertaining to child support, that was the only evidence. The court noted that Chrystian wanted custody changed to his father, and Cameron wanted equal time with his parents, and proceeded to summarize the testimony of the boys as described above. The court concluded both parents were fit to have custody, and that "[b]oth parents appear to have the children's best interests in mind, as reflected, in part, in their willing agreement not to be present in the courtroom to allow their boys to speak freely with the Court." The court next examined whether modification of custody was required due to the best interests of the children.

The court found Chrystian "obviously is very attached to his father and the environment provided at father's home keeps Chrystian engaged in activities other than video games." The court also noted that Chrystian enjoys working with his father on mechanics in the shop, enjoys the general outdoor environment at his father's place, and enjoys the "go-carts, motorcycles and the like with his father." The court stated, "The time his father spends with him is truly enjoyed by Chrystian."

In contrast, the court discussed Chrystian's routine at his mother's house where upon coming home from school, he immediately goes to his room and plays video games. He emerges from his room briefly to get dinner, although sometimes eats in his room, and then returns to his video games for the remainder of the evening. The court stated, "It seems to the Court that Chrystian resents not having the same type of relationship with Mom as he has with Dad. He blames Mom for this seeming lack of close relationship."

As for Cameron, the court noted that he "seems to enjoy being with his mother as well as his father and would just prefer to have 'equal' time with both parents." The court concluded, however,

> that Dad is more engaged with the boys, than Mom, and he personally involves both boys in activities as a family or just with Dad. This is a substantial beneficial and positive environment for both boys and they, in their own manner, expressed this clearly through their respective testimonies. While Mom has not been found unfit, the evidence is clear that Mom is not as actively engaged with the boys and allows them to stay in their rooms for extended periods of time without interacting with them. This, in the Court's opinion, is detrimental to the boys' overall well-being and not in their best interests and warrants a finding of a material change in circumstances.
>
> . . . .
>
> The relationship between the mother and Chrystian has deteriorated to the point that Chrystian seems almost hostile when speaking of his mother. Chrystian is isolated and allowed to continue to be isolated at his mother's home, which this Court finds is not in his best interests. Dad is involved with Chrystian on a day-to-day basis which the Court finds is in Chrystian's best interests.

Cameron, while somewhat ambivalent and desiring to live with both parents on a 50/50 basis, does express that life at Dad's is more rewarding and enjoyable. Both minors expressed their desires sufficiently and the reasons for their desires were articulated well for the Court.

(Emphasis in original.)

The district court ordered continuation of joint legal custody, but that physical custody of the children was awarded to Ronny. Parenting time was awarded to Lori as set forth in the "Seventh Judicial District's Uniform Visitation Guidelines," but the every other weekend parenting time was expanded to commence on Thursdays after school or 5:00 p.m., whichever was later, and conclude on that next Monday morning at 9:00 a.m.

## ASSIGNMENT OF ERROR

Restated, Lori assigns that the district court erred in finding a material change in circumstances warranting modification of the divorce decree as to the physical custody of the children.

## STANDARD OF REVIEW

Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *State on Behalf of Jakai C. v. Tiffany M.*, 292 Neb. 68, 871 N.W.2d 230 (2015).

An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015).

## ANALYSIS

Lori argues that the district court "erred in finding that Ronny met his burden of showing a change in circumstances warranting a modification of the physical custody of Chrystian and Cameron, or that a change in custody was in their best interest." Brief for appellant at 12. She states that Ronny alleged as "his only ground for a material change in circumstances" that the boys have expressed a desire to reside with their father. *Id.* She acknowledges that the wishes of a child of sufficient age are entitled to consideration, but that the district court "appears to have made Chrystian's desire to live with Ronny controlling in its decision, which is erroneous and must be reversed." *Id.*

The legal principles governing modification of child custody are well settled. Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). A material change in circumstances means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. *Id.* The party seeking modification of child custody bears the burden of showing a change in circumstances. *Id.* Before custody may be modified based upon a material change in

circumstances, it must be shown that the modification is in the best interests of the child. *Id.* Importantly, the best interests of the child are paramount. *Steffy v. Steffy*, 287 Neb 529, 843 N.W.2d 655 (2014).

## MATERIAL CHANGE IN CIRCUMSTANCES

The district court concluded there had been a material change in circumstances affecting both boys. In its modification order, the court stated that Ronny is more engaged with the boys than Lori, and that Ronny involves the boys in activities with himself and as a family. The court added, "This is a substantial beneficial and positive environment for both boys and they, in their own manner, expressed this clearly through their respective testimonies." The court went on to note that although Lori had not been found unfit, the evidence demonstrated that she was not as actively engaged with the boys and "allows them to stay in their rooms for extended periods of time without interacting with them." The district court found that this was "detrimental to the boys' overall well-being and not in their best interests and warrants a finding of a material change in circumstance."

Lori relies on *Adams v. Adams*, 13 Neb. App. 276, 691 N.W.2d 541 (2005), which she says is "a case on point." Brief for appellant at 12. In that case, the daughter at issue in a custody modification action was 12 years old at the time her parents initially divorced; and at that time, the parties agreed the father would have physical custody of the parties' two daughters. The mother had been an alcoholic since the age of 20, and this was one of the problems that led to the divorce. Three years after the divorce, the mother filed an action to modify custody of the younger daughter; by the time the modification action went to trial, that daughter was 16 years old. In addition to the daughter's testimony stating her preference to live with her mother, both parents testified. The district court denied the mother's request to change physical custody, noting that although the mother appeared to have made gains in treating her alcohol problem, the mother's relationship with her current husband involved screaming, shouting and an assault. The district court found neither parent was unfit, that the daughter loved both parents, and that the daughter's preference was to live with her mother, even though the daughter found little fault with her father. Among other reasons provided in support of its decision not to change custody, the district court expressed concern about whether the mother would encourage the daughter's relationship with the father because based on past behavior, the mother demonstrated she did not feel obligated to follow orders of the court. The district court concluded it was not in the daughter's best interests to change custody. *Adams*, *supra*.

On appeal, we concluded that "our de novo review of the record does suggest that a material change in circumstances affecting [the child's] best interests has indeed occurred[.]" *Adams v. Adams*, 13 Neb. App. at 285, 691 N.W.2d at 549. We noted that the child's relationship with each parent had changed and that the mother's behavior had improved. We acknowledged that the daughter appeared to have a better relationship with her mother than her father, and that she clearly preferred to live with her mother. "However, the district court's order makes it clear that in its judgment, [the daughter's] general health and welfare would be best served by her remaining in [her father's] custody." *Id*. at 286-87, 691 N.W.2d at 550. We concluded it was not an abuse of

discretion for the district court to find that it was in the daughter's best interests to remain in her father's custody.

Lori argues, that unlike the child in *Adams*, *supra*, "Chrystian's reasoning for wanting to live with Ronny can be considered, at best, immature," which she says the district court noted in its order. Brief for appellant at 13. Lori states the evidence showed both boys to be "well adjusted, normal teenage boys." *Id.* at 14. Further, the "only reason Chrystian desired to live with Ronny was that he perceived Ronny as the fun parent," and that "Lori was 'boring.'" *Id.* Lori suggests that Ronny "failed to meet his burden of showing a material change in circumstances," as there was no testimony Ronny ever spent an extended time with the boys; in fact, the boys spent their summer with their older brother rather than their father. And, she says, "[t]here was no evidence Ronny ever attended to the boys' medical needs, made any of their meals, or attended any of their events." *Id.* at 15. Lori appears to be arguing that the things the boys failed to discuss should carry more weight than the things they did discuss. It bears reminding here that the parties agreed that the boys would testify and no further evidence regarding custody would be offered. Therefore the trial court and this court are limited to considering only what the boys did say, all of which was unrefuted by any other evidence.

We do not find *Adams*, *supra*, supportive of Lori's position that there was no material change in circumstances in this case. As noted above, we concluded the evidence in *Adams* was sufficient to find a material change in circumstances based upon the child's changing relationship with each parent and positive changes in the mother's behavior since the time of divorce; we find the evidence in this case to likewise support a material change in circumstances. The application of *Adams, supra,* to this case may have more persuasive value in the best interests analysis, which we discuss later.

We find *Floerchinger v. Floerchinger*, 24 Neb. App. 120, 883 N.W.2d 419 (2016), to be more relevant to our analysis, both with regard to a material change in circumstances and best interests. In *Floerchinger*, this court affirmed a district court's modification of a change in physical custody based upon a material change in circumstances stemming from a son's expressed desire to live with his father in Nebraska. The son had been living with his mother in Maine for almost 11 years; at the time of trial, he was 13 years old. In that case, the son testified that he preferred living in Nebraska due to the comfortable and relaxed environment at his father's house and because he enjoyed the interaction he had with his father. In Maine, among other things, the son stated he was pestered by his stepsiblings.

We noted that the Nebraska Supreme Court has stated that "while the wishes of a child are not controlling in the determination of custody, if a child is of sufficient age and has expressed an intelligent preference, the child's preference is entitled to consideration." *Floerchinger v. Floerchinger*, 24 Neb. App. at 140-41, 883 N.W.2d at 434 (citing to *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002)). Further, "in cases where the minor child's preference was given significant consideration, the child was usually over 10 years of age." *Id.* at 141, 883 N.W.2d at 434. In *Floerchinger*, the district court found a material change in circumstances had occurred subsequent to the decree which justified modification of custody and that such modification was in the best interests of the child. We noted that "[t]he [district court] specifically focused on [the

child's] desire to reside with [his father] in Nebraska, concluding that [the child] was articulate and that his decision was based on sound reasoning." *Id.*

We are also guided by *Miles v. Miles*, 231 Neb. 782, 438 N.W.2d 139 (1989), where our Supreme Court affirmed a district court's decision to modify custody of a 15-year-old child from his mother to his father. The evidence in that case showed that the son had "a poor emotional relationship with his mother" and that she "has lost control of her son." *Id.* at 784, 438 N.W.2d at 141. The son constantly expressed the desire to live with his father and engaged in violent and troubling behaviors. The son told the judge he "needed more discipline and that he felt his father was the only one who could provide it." *Id.* at 785, 438 N.W.2d at 142. Mental health experts supported the change. Our Supreme Court concluded that the "deterioration of the relationship between [the son] and his mother, her inability to control or discipline him, and his obvious preference for living with his father clearly constitute a material change of circumstances which in the best interests of [the son] mandated a modification of custody." *Id.* While there were certainly more extreme child behavioral issues in *Miles* than in this case, it is nevertheless instructive that the deterioration of a child/parent relationship and a child's preference can support a material change of circumstances.

The cases discussed above which involved children expressing their preferences on custody: *Adams*, *supra*, (child's relationship with each parent changed), *Floerchinger*, *supra* (better interaction with father, and more comfortable, relaxed environment at father's house), and *Miles*, *supra* (deterioration of child/parent relationship), all support the district court's determination in this case that there had been a material change in circumstances. Chrystian was isolated at his mother's house, his relationship with his mother had deteriorated, and there was better interaction and a more engaged family-oriented environment at Ronny's house. Further, as noted by the district court, the lack of interaction between Lori and both boys was "detrimental to the boys' overall well-being and . . . warrants a finding of a material change in circumstances." We conclude the district court did not abuse its discretion in making this determination.

However, before custody may be modified based upon a material change in circumstances, it must be shown that the modification is in the best interests of the child. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). We consider that next.

BEST INTERESTS

Neb. Rev. Stat. § 43-2923(6) (Cum. Supp. 2014) requires a court, in determining custody and parenting arrangements, to consider certain factors relevant to the best interests of the minor child, including in pertinent part: the relationship of the minor child to each parent prior to the commencement of the action, the desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning; and the general health, welfare, and social behavior of the minor child. Additionally, a court may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude

- 10 -

and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child. *Schrag, supra.*

We recall here Lori's reliance on *Adams v. Adams*, 13 Neb. App. 276, 691 N.W.2d 541 (2005), where this court affirmed a district court's decision to leave a minor daughter in her father's custody despite the daughter's preference to live with her mother. It appears Lori is arguing that *Adams* is an example of a child's preference not controlling the outcome of the custody decision; hence, such a preference should not control here. We agree that a child's preference should not be the controlling factor; rather, a child's preference is one factor that may be considered by a trial court in deciding the best interests of the child in a custody decision. However, as in *Adams*, a child's preference on custody was not the only "best interests" factor considered by the district court. The district court in the present case found that Ronny was more engaged with the boys than Lori, and that he involved the boys in family activities. The court specifically found that Lori was not as actively engaged with the boys and allowed them to stay in their rooms for extended periods of time without interaction. The court found this to be "detrimental to the boys' overall well-being and not in their best interests[.]" Significantly, the court found:

> The relationship between the mother and Chrystian has deteriorated to the point that Chrystian seems almost hostile when speaking of his mother. Chrystian is isolated and allowed to continue to be isolated at his mother's home, which this Court finds is not in his best interests. Dad is involved with Chrystian on a day-to-day basis which the Court finds is in Chrystian's best interests.

Further, with regard to Cameron, the court stated that "while somewhat ambivalent and desiring to live with both parents on a 50/50 basis, [Cameron] does express that life at Dad's is more rewarding and enjoyable." Finally, the court found that "[b]oth minors expressed their desires sufficiently and the reasons for their desires were articulated well for the Court."

The district court did not place controlling weight on the boys' preferences on where to live; rather, the court focused more on the existing relationships between the children and each parent, as well as the overall environments available for the children at each parent's home. The higher level of activity and engagement at Ronny's home was preferred over the isolation in the basement watching television and playing video games at Lori's home. Further, while the presence of Ronny's girlfriend and her daughters was open and more family-oriented with dinners, movies and board games, the presence of Lori's boyfriend was more secretive and made Chrystian feel as though "there's something not right." That the district court observed Chrystian to seem "almost hostile when speaking of his mother," is troubling, and we agree with the district court that the deterioration of Chrystian's relationship with his mother and his isolation at his home are not in his best interests. We also find troubling Lori's persistence in asking the boys for details of their weekends with their father and then being obvious about not liking what she heard, such as Nicole making the boys dinner. Also problematic were Lori's persistent attempts to discuss the pending court case, and her anger when Ronny would buy the boys something, like how "she threw a big fit" when Ronny bought new shoes for Cameron. We cannot say the district court abused its discretion in finding that a change in physical custody from Lori to Ronny was in children's best interests.

Lori argues that even if the evidence supports a change in physical custody for Chrystian, "there is absolutely no evidence in the record to support changing the physical custody of Cameron from Lori to Ronny." Brief for appellant at 15. Lori acknowledges that public policy favors keeping children together whenever possible, but such policy does not, in all cases, prevent the splitting of the custody of children. She suggests that the boys were not so bonded that they could not be separated, they did very little together, they went to different schools, they had different friends, and they only seemed to spend time together at Ronny's riding their various vehicles through town, which they could continue to do on alternating weekends. Lori notes that although Cameron testified he desired equal parenting time, "he felt more comfortable talking to Lori[,]" and that "Lori listened to him." Brief for appellant at 16.

It is sound public policy to keep siblings together when a marriage is dissolved, but the ultimate test remains the best interests of the children. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). When deciding custody issues, the court's paramount concern is the child[ren]'s best interests. *Id.* However, considerations of public policy do not, in all cases, prevent the splitting of the custody of the children; rather, the ultimate standard is the best interests of the children. *Boroff v. Boroff*, 197 Neb. 641, 250 N.W.2d 613 (1977). See, also, *Beran v. Beran*, 234 Neb. 296, 450 N.W.2d 688 (1990) (close relationship between youngest and oldest daughters was strong factor warranting reversal of trial court's split custody order).

The district court stated, "Cameron, while somewhat ambivalent and desiring to live with both parents on a 50/50 basis, does express that life at Dad's is more rewarding and enjoyable." Further, the record reveals that Cameron and Chrystian enjoy doing many activities together, like riding around in their various vehicles, playing games, working on cars or four-wheelers in the garage, and spending time with their older brother on the farm in Atkinson. The brothers clearly share enough of a bond that when their mother was angry about the sign Cameron made that said, "rest in peace 1994 Ford Ranger," they both took off together, on foot, united in their cause.

While the "best interests" evidence favoring a change in custody was stronger with regard to Chrystian, it is evident that the district court was also concerned about the relationships each parent had with the children. The court found Lori's lack of interaction with both boys was "detrimental to the boys' overall well-being and not in their best interests[.]" Taking into consideration those findings along with the public policy interests in keeping siblings together, we cannot say the district court abused its discretion by awarding physical custody of both boys to Ronny.

CONCLUSION

The district court did not abuse its discretion by modifying the divorce decree to award physical custody of the children to Ronny; we affirm the court's order.

AFFIRMED.