IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

NELMS V. NELMS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JESSICA ANN NELMS, APPELLANT,

V.

MITCHELL ALAN NELMS, APPELLEE.

Filed December 10, 2019.    No. A-18-1087.

Appeal from the District Court for Red Willow County: DAVID W. URBOM, Judge. Affirmed as modified.

Adam R. Little, of Ballew Hazen, P.C., L.L.O., for appellant.

Megan M. Zobel, of Anderson, Creager & Wittstruck, P.C., L.L.O., for appellee.

MOORE, Chief Judge, and BISHOP and ARTERBURN, Judges.

ARTERBURN, Judge.

## I. INTRODUCTION

Jessica A. Nelms appeals from a decree of dissolution entered by the district court for Red Willow County, which decree dissolved her marriage to Mitchell A. Nelms, divided the marital assets and debts, awarded Mitchell sole physical custody of the parties' minor child, and ordered her to pay child support. On appeal, Jessica challenges the district court's property distribution and its decision to award Mitchell sole physical custody of the minor child. For the reasons that follow, we affirm the district court's decision as to custody, and we modify in part the district court's decision as to the property division.

## II. BACKGROUND

Jessica and Mitchell were married in December 2013. They had one child together, Marcus, born in October 2013. In addition, they each have a child from a prior marriage. Jessica has a son

- 1 -

who was 11 years old at the time of these proceedings. Mitchell has a daughter who was 10 years old at the time of the proceedings. After 2 years of marriage, the parties separated in January 2016, and Jessica filed a complaint for dissolution of marriage on February 1.

After a hearing on February 14, 2017, the district court entered a temporary order regarding custody of Marcus pending the dissolution proceedings. The court awarded Jessica sole custody of Marcus subject to Mitchell's parenting time, which was to occur every other Thursday from 5 p.m. through Monday at 8 a.m. and every Wednesday evening from 5 p.m. to 8 p.m. The court ordered Mitchell to pay child support. In addition, the court noted that "[b]y stipulation, [Jessica] is granted temporary possession of the marital home and [Mitchell] is excluded therefrom."

In October 2017, the district court altered Mitchell's parenting time in order to minimize contact between the parties. Mitchell was to pick up Marcus from preschool or daycare at the start of his parenting time and was to drop off Marcus at preschool or daycare at the conclusion of his parenting time. Mitchell's midweek parenting time was changed from Wednesday evenings to Tuesday evening at 5 p.m. through Wednesday morning at 8 a.m. Additionally, the court approved Jessica's use of premarital funds to purchase a home in Cambridge, Nebraska.

Trial began on December 5, 2017. On the first day of trial, Jessica testified at length regarding her living situation, her employment and finances, and her relationship with Marcus. Jessica testified that she was currently living in Cambridge, Nebraska, in a home she had purchased approximately 6 weeks prior to the start of the trial. Jessica explained that she had wanted to move away from Indianola, Nebraska, where she and Mitchell had resided during their marriage, because she did not have a support system there. Both Marcus and her older son were enrolled in school in Cambridge, and their house was located across the street from the school. Jessica testified that she believed that the Cambridge house was a good investment.

Jessica also testified that she desired to be able to move to Norfolk, Nebraska, with Marcus in the near future. She planned to buy a home in Norfolk and have Marcus attend a preschool which was religious based and which had small class sizes. Jessica explained that if she moved to Norfolk she would be much closer to her family, including her father, her grandparents, and some of her aunts, uncles, and cousins. Jessica admitted that she had only informed Mitchell of her plans to move to Norfolk the day before trial.

During her cross-examination, Jessica testified that she had moved approximately eight times since the birth of her older son 11 years ago. She explained that these moves were mostly as a result of her financial circumstances after her first divorce. In addition, she initially moved to Nebraska from Kansas in order to assist with taking care of her mother's health needs. Jessica further explained that she buys and sells real estate in order to supplement her income. She has "flipped" eight houses and has generated a profit from this work. Evidence in the record reveals that Jessica often lives in the homes she renovates prior to selling them.

In addition to buying and selling real estate, Jessica had owned her own cleaning business since July 2015. As a part of that business, she and her employees cleaned, organized, and painted residential and commercial properties. Jessica testified that by the time of the first day of trial in December 2017, she had lost a lot of her clients and, as a result, she was not receiving much, if any, income from her cleaning business. Jessica believed that she needed new employment in order to support herself and her children.

Prior to owning her cleaning business, Jessica had been employed as an engineering technician, generating computer drawings for engineers. She had last been employed in this capacity in 2012, but in the days leading up to trial, she had applied for an engineering drafting job at a steel manufacturer in Norfolk. Jessica indicated that she had already heard back from the company and if she was offered the job, she would start working full time on January 15, 2018. Jessica did stress that her desire to move to Norfolk was not contingent on her getting the engineering drafting job. She wanted to move to Norfolk in order to be closer to her family, and she indicated that she really liked the preschool she had found for Marcus there.

Jessica testified that she brought significant assets into the marriage, totaling approximately $179,000. She believes that as a result of her premarital assets, she made "an uneven contribution financially to the marriage." In particular, Jessica testified that her premarital funds had contributed significantly to the purchase of the marital home. She indicated that she wanted to be awarded the marital home so that she could sell it and "[g]et [her] money back out of it." Jessica testified that if Mitchell was awarded the marital home and planned to reside there, he would need to "buy [her] out."

Jessica and Mitchell opened a joint checking account in 2014. During the marriage, they both deposited their pay checks into the joint checking account. At the time of their separation in January 2016, the balance of the joint checking account totaled between $25,072 and $27,167. The day after Jessica and Mitchell separated, Jessica withdrew $12,000 from the joint checking account and deposited it into a separate account. Jessica testified that she withdrew the money because she was concerned that Mitchell would spend all of the money in the joint account. She indicated that she did not intend to spend the money, she only wanted to preserve it. That same day, Jessica wrote a check from the joint account in the amount of $1,500 in order to pay her attorney's retainer. Three days later, Jessica withdrew an additional $2,700 from the joint account and deposited it into her separate account. Subsequently, an automatic payment to a jointly held credit card left approximately $1,000 in the joint account. Jessica testified that she continued to use the joint account after the parties' separation in order to pay bills.

Jessica asked that the district court award her sole physical and legal custody of Marcus. She indicated that she has been primarily responsible for Marcus' day-to-day needs since his birth and that they have a very strong mother-son bond. She stated she was a stay-at-home mother for Marcus from his birth until July 2015 when she started her cleaning business. Jessica testified that she has never been apart from Marcus for a long period of time and that, as a result, if Mitchell were awarded custody, it would be difficult for Marcus. Jessica explained that during the parties' separation when Mitchell would have parenting time with Marcus, he would sometimes return Marcus to Jessica at night because Marcus slept better with her.

Jessica testified that Marcus and her older son have a close relationship, as they have been raised together since Marcus' birth. Jessica indicated that she is capable of providing both of her sons with a safe and stable home environment. And, while Jessica testified that Mitchell was not a bad dad, she also indicated that he has not been as involved with caring for Marcus as she has. Jessica affirmatively stated that she would foster a relationship between Mitchell and Marcus even after she moved to Norfolk, which is 4 hours away from Indianola, where Mitchell continues to

reside. She proposed that Mitchell could have parenting time with Marcus during his breaks from school and during the summer.

Jessica indicated that she should be awarded sole legal custody of Marcus because she and Mitchell do not communicate effectively and do not agree on many issues. Jessica testified that if she is given legal custody, she will ensure that Mitchell is always informed regarding Marcus.

After Jessica testified, she rested. Mitchell then called two witnesses to testify on his behalf. First, Brooke Brooks, Mitchell's ex-wife and the mother of his older child, testified. She testified that Mitchell is a very good parent and that the two of them communicate on a daily basis regarding their daughter. Mitchell has parenting time with his daughter for 4 days every 2 weeks during the school year. During the summer, he has parenting time for 10 days every 2 weeks. Marcus has a relationship with his half sister. Brooks testified that she and Mitchell had previously shared equal parenting time, but she sought to change that schedule due to the actions of Jessica.

Jeanette Nelms, Mitchell's sister-in-law and Jessica's cousin, also testified. She testified that she believes Mitchell to be an appropriate parent. However, she does not believe that Jessica's primary focus is her children. Jeanette also testified that Jessica does not have a good relationship with her extended family in Norfolk as Jessica suggested during her trial testimony.

At the close of the first day of trial, the court indicated that trial was to resume on February 28, 2018. However, trial did not resume again until April 30. During the almost 5 months between the first and second days of trial, the parties continued to litigate temporary parenting time with Marcus.

On December 7, 2017, 2 days after the first day of trial had concluded, Jessica filed a motion to modify the temporary visitation plan. In the motion, Jessica alleged that she was planning to move to Norfolk on December 22, that Marcus was to start school on January 8, 2018, and that, as a result, the current visitation plan was no longer feasible. After a hearing, the district court modified Mitchell's parenting time with Marcus such that he was to have Marcus every other week from Saturday at 6 p.m. to the following Saturday at 6 p.m.

Jessica filed another motion to modify the temporary visitation plan on March 12, 2018. In this motion, Jessica affirmatively alleged that she had moved to Norfolk on December 22, 2017. The district court denied Jessica's motion. Mitchell continued to have visitation with Marcus every other week.

The first witness on the second day of trial was Mitchell's mother, Susan Nelms. Susan testified that she and Mitchell's father live approximately two blocks from Jessica and Mitchell's marital home. Susan testified that the Nelms family has lived in the Indianola area for over 100 years. She testified that she believes that Mitchell is a good father and that she, and her whole family, are very supportive of Mitchell's relationship with Marcus. When Jessica and Mitchell were still living together, Susan often watched both Marcus and Jessica's older child 3 to 5 days per week. Now, Susan assists Mitchell with Marcus during the weeks he has parenting time.

Susan also testified regarding an incident between herself and Jessica which occurred just a few weeks prior to the second day of trial. On April 5, 2018, Susan was watching Marcus at her home when Jessica arrived unexpectedly, seemingly to say hello to Marcus. Ultimately, however, Susan and Jessica got into an argument over items in Susan's possession and Jessica hit Susan in

the chest. While Jessica was hitting Susan, Marcus was present. In fact, Susan described that Jessica had her left arm around Marcus while she was hitting Susan with her right hand.

Mitchell also testified on the second day of trial. At that time he lived in a rental home in Indianola which was owned by his parents. Immediately after his separation from Jessica, he lived with his parents. He moved into the rental home during the spring of 2017. Mitchell testified that he wanted to be awarded the marital home so that he could move back into the home with Marcus. In fact, Mitchell testified that he had wanted to move back to the marital home throughout the proceedings, but Jessica would not let him, even after she had moved out of Indianola and purchased the home in Cambridge. Mitchell also testified that he made many improvements to the marital home during the marriage, including redoing the hardwood flooring, renovating an upstairs bathroom, completing work in preparation of putting in central heating and air conditioning, and working on the home's plumbing.

Mitchell is employed by the City of Indianola as a utilities supervisor and had worked in that capacity for 5 years prior to trial. Mitchell testified that he works 5 days a week from 8 a.m. to 4:30 p.m. during the winter months and from 7 a.m. to 3:30 p.m. during the summer months. In 2017, he earned between $42,000 and $44,000.

Mitchell testified that after the parties separated in January 2016, he continued to deposit his paychecks into the joint checking account. He did this through January 2017, at which time he opened his own checking account. Mitchell indicated that during the parties' separation, he never made any large cash withdrawals from the joint checking account, but he did use the account to pay his normal living expenses.

During his testimony, Mitchell asked the district court to award him full custody of Marcus. While Mitchell indicated that it had been "awesome" spending time with Marcus every other week, he also indicated that such a schedule cannot continue because Marcus would be starting school soon. Mitchell testified that he can provide Marcus with stability. He wanted to live with Marcus in Indianola, where Marcus had primarily resided since his birth. Marcus would continue to attend his preschool in Indianola if Mitchell is awarded custody. In addition, Marcus and Mitchell's older daughter would continue to see each other on a regular basis.

Mitchell testified regarding his concerns about Jessica's parenting. He testified that he believes that Jessica loves her children, but that, in his opinion, she is not a good mother. Mitchell testified that Jessica provides her children with a chaotic living environment that lacks routine and structure. He pointed to her numerous moves as evidence of her lack of stability and her failure to consider her children when making decisions. Mitchell also testified that he believes that Jessica's behavior is often inappropriate. Such behavior includes screaming and disciplining her older son inappropriately. Mitchell also noted that the communication between he and Jessica is "poor." Ultimately, though, Mitchell testified that if he is awarded custody of Marcus, he would not interfere with Jessica's relationship with Marcus. However, Mitchell was concerned that if Jessica is awarded custody, she would keep Marcus from him or would move Marcus farther away from Indianola.

After Mitchell's testimony, he called Jessica to testify again. During this testimony, Jessica indicated that she was currently unemployed. She had only worked at the engineering drafting job in Norfolk for 6 weeks before voluntarily resigning her position. She testified that she was

considering re-establishing her cleaning business or renovating additional houses. Jessica also testified that she was not living in Norfolk. Instead, she was residing in Newman Grove, Nebraska. She had been living with her father, but recently had begun living in and helping to renovate the basement of a church owned by her brother. Jessica testified that she planned on staying in Newman Grove and was no longer looking to move to Norfolk.

Jessica's counsel called her to the stand to testify for a third time on rebuttal. The bulk of this rebuttal testimony concerned whether the marital home was ready for sale.

On September 25, 2018, the district court entered a decree dissolving the marriage between Jessica and Mitchell. The court awarded the parties joint legal custody of Marcus and awarded Mitchell sole physical custody. The court awarded Jessica parenting time with Marcus every other weekend from 6 p.m. on Friday until 6 p.m. on Sunday. In addition, Jessica was to have parenting time for 8 consecutive weeks during Marcus' summer vacation from school. Jessica was ordered to pay child support in the amount of $312 per month.

In dividing the parties' property, the court awarded the marital home to Mitchell. The court did not require Mitchell to refinance the mortgage on the home. It did, however, require Mitchell to pay an equalization payment of $50,000 to Jessica. Mitchell was to pay $10,000 to Jessica by December 31, 2018. He was then to pay the additional $40,000 over the next 4 years by paying $10,000 per year to include interest at the judgment rate. Including Mitchell's equalization payment, the court divided the marital property such that Mitchell received 56 percent of the marital estate and Jessica received 44 percent of the estate. Neither party was awarded alimony or attorney fees.

Jessica appeals.

## III. ASSIGNMENTS OF ERROR

Jessica alleges that the district court erred with respect to its property division by failing to properly classify and credit her for her premarital financial contributions; by failing to require Mitchell to refinance the marital home, which was awarded to him in the decree; and by inequitably dividing the marital estate, given her significant financial contributions to the marriage. Jessica also alleges that the district court erred in awarding Mitchell sole physical custody of Marcus.

## IV. STANDARD OF REVIEW

In an action for dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Mamot v. Mamot*, 283 Neb. 659, 813 N.W.2d 440 (2012). An abuse of discretion occurs when the trial court's decision is based upon reasons that are untenable or unreasonable or its action is clearly against justice or conscience, reason, and evidence. *Adams v. Adams*, 13 Neb. App. 276, 691 N.W.2d 541 (2005).

## V. ANALYSIS

### 1. PROPERTY DIVISION

Under Neb. Rev. Stat. § 42-365 (Reissue 2016), the equitable division of property is a three-step process. *Westwood v. Darnell*, 299 Neb. 612, 909 N.W.2d 645 (2018). The first step is to classify the parties' property as marital or nonmarital. *Id.* The second step is to value the marital assets and marital liabilities of the parties. *Id.* The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Westwood v. Darnell, supra.* The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case. *Id.* Jessica presents arguments relating to all three steps in this process.

### (a) Classification of Property as Marital or Nonmarital

As a general rule, all property accumulated and acquired by either party during the marriage is part of the marital estate, unless it falls within an exception to the general rule. *Westwood v. Darnell, supra*. Exceptions to the rule that all property accumulated and acquired during the marriage is marital property includes property accumulated and acquired through gift or inheritance. *Id.* Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse. *Marshall v. Marshall*, 298 Neb. 1, 902 N.W.2d 223 (2017). But if the separate property remains segregated or is traceable into its product, commingling does not occur. *Id*. The burden of proof rests with the party claiming that property is nonmarital. *Id.* Setting aside nonmarital property is simple if the spouse possesses the original asset, but can be problematic if the original asset no longer exists. *Id.* In an action for dissolution of marriage, a court may divide property between the parties in accordance with the equities of the situation, irrespective of how legal title is held. *Claborn v. Claborn*, 267 Neb. 201, 673 N.W.2d 533 (2004). Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property. *Stephens v. Stephens*, 297 Neb. 188, 899 N.W.2d 582 (2017).

### (i) $30,000 Proceeds From Sale of Tahoe

Prior to the parties' marriage, Jessica purchased a 2010 Chevrolet Tahoe for $32,950. In September 2014, 9 months after the parties' marriage, Jessica sold the Tahoe for $30,000 and deposited the proceeds from the sale into the parties' joint checking account. Jessica testified at trial that she sold the Tahoe so that she and Mitchell could pay for a downpayment on the marital home, which they purchased in October 2014, shortly after the sale of the Tahoe. Specifically, Jessica testified that $18,000 from the proceeds of the sale of the Tahoe went directly toward paying for the downpayment. Mitchell conceded that at least a portion of the Tahoe proceeds went toward paying for the marital home, but he was not sure what portion of the proceeds were used in this manner. Mitchell did testify to his belief that the proceeds from the sale of the Tahoe did not go toward paying the $18,000 downpayment on the marital home.

Jessica explained that the $12,000 remaining from the sale proceeds of the Tahoe also went toward the marital home. The parties agree that they received at least $16,000 from Mitchell's

parents which was to go toward the purchase of the marital home. Jessica testified that in addition to these funds, her father gifted them an additional $5,000. Taken together, this $21,000 in gifts went toward the $24,281 payment due at the closing for the marital home. Jessica asserts that the proceeds from the sale of the Tahoe went toward paying the difference between the money received from their parents and the money due at closing. Additionally, Jessica testified that the remainder of the proceeds from the Tahoe went toward putting in a waterproofing system in the home's basement and other miscellaneous home improvement projects. Jessica indicated that the proceeds from the Tahoe had to be used for these large expenditures because there was no other substantial funds in the joint checking account at the time of purchasing the marital home. However, contrary to Jessica's testimony in this regard, documentary evidence from the parties' joint checking account reveals that in October 2014, just prior to the purchase of the marital home, the joint checking account had a balance of almost $70,000.

At trial, Jessica asked that the entirety of the $30,000 sale proceeds from the Tahoe be credited to her. In the decree of dissolution, the district court gave Jessica an $18,000 credit for premarital funds from the sale of the 2010 Tahoe which were used toward the purchase of the marital home. On appeal, Jessica argues that the district court erred in awarding her only an $18,000 credit rather than a credit for the entirety of the $30,000 sale proceeds. Upon our review, we find no abuse of discretion in the court's decision to award Jessica only $18,000 in credit from the proceeds of the sale of the premarital Tahoe.

Jessica testified that after receiving $30,000 from the sale of the Tahoe, she deposited the money into the parties' joint checking account. As such, while the entire $30,000 was originally Jessica's separate property, by placing the money into the joint checking account, she commingled her separate property with marital property. It became Jessica's burden of proof to trace where the $30,000 went after being deposited into the joint checking account in order to demonstrate that the money remained her separate property. Here, the district court found credible Jessica's testimony that $18,000 of the proceeds went toward the downpayment on the marital home. Neither party assigns as error the court's decision regarding this $18,000. And, we note that there is evidence in the record to support the district court's decision. The downpayment for the marital home was made shortly after Jessica sold the Tahoe and Mitchell conceded during his testimony that some portion of the proceeds from the Tahoe went toward the marital home.

Jessica does assert that the district court erred in failing to credit her for the additional $12,000 from the proceeds of the sale of the Tahoe. Upon our review, we find that Jessica failed to sufficiently demonstrate that the $12,000 was set aside to pay for the marital home, rather than simply commingled with the other monies in the parties' joint checking account. Jessica testified that the $12,000 went toward paying a portion of the amount due on the marital home at closing and that the remainder of the money went toward paying for home improvements. However, while not required, Jessica produced no documentary evidence tying the $12,000 directly to any of these expenses. The documentary evidence did indicate that around the time the Tahoe was sold the parties had almost $70,000 in their joint checking account. As such, the remaining $12,000 from the proceeds of the Tahoe sale were not necessarily used in paying for the closing costs or in making any specific home improvements. Rather, it is possible that other marital funds were used in paying for these expenditures. Moreover, even if we accepted the premise that premarital funds

were used to pay for improvements, there was no testimony that established what increase in value accrued to the house due to those improvements. Simply stated, the district court found that Jessica failed to meet her burden of proving that the $12,000 remained her separate property. On our standard of review, we cannot find that the district court abused its discretion in making this determination.

*(ii) $18,000 Proceeds From Sale of Suburban*

Jessica testified that during the parties' marriage, she purchased a 2008 Chevrolet Suburban with funds acquired through the sale of her premarital real property. The cost of the Suburban was $18,000. Jessica testified that she paid for $16,000 of the purchase price using the funds from the sale of her premarital real estate and put $2,000 of the purchase price on her credit card.

After the parties separated, Jessica sold the Suburban. Jessica testified that she sold the Suburban for $15,000. She believed that she was entitled to all of the sale proceeds because the vehicle was purchased with premarital funds. However, the only way that Mitchell would agree to sign over the title of the Suburban was if he was paid a portion of the proceeds. Jessica indicated that she gave Mitchell $5,000 from the proceeds and kept the remaining $10,000. Mitchell testified that Jessica actually sold the Suburban for $17,250. He explained that Jessica agreed to pay him half of the sale proceeds because she wanted to sell the vehicle at a time when the court had ordered that no property was to be disposed of by either he or Jessica. Jessica paid him $5,000 of the proceeds from the sale. Mitchell was still waiting for the remaining $2,500 he believed he is owed from the sale.

In the decree of dissolution, the district court assigned as marital property which was awarded to Jessica, $10,000 in proceeds from the sale of the Suburban. In addition, the court gave Jessica a $16,000 credit for premarital funds from the sale of her premarital real estate which were used toward the purchase of the Suburban. The court assigned as marital property which was awarded to Mitchell, $5,000 in proceeds from the sale of the Suburban. On appeal, Jessica argues that the district court committed two errors in its treatment of the Suburban. First, she asserts that the court should have credited her for the entire $18,000 purchase price of the Suburban, rather than only the $16,000 she paid in cash for the vehicle. She asserts that the evidence presented at trial demonstrated that even though $2,000 of the purchase price was paid with a credit card, that the card was paid off immediately using her premarital funds. Second, Jessica asserts that the district court erred by both giving her a credit for the Suburban as her nonmarital property and by including $10,000 from the sale of the Suburban as a marital asset awarded to her. "This is a double dip, if it is premarital it should be considered as such." Brief for appellant at 16.

In his brief on appeal, Mitchell agrees that the district court erred in its treatment of the Suburban. However, Mitchell asserts that the error should be rectified by eliminating both the $5,000 in sale proceeds awarded as his marital property and the $10,000 in sale proceeds awarded as Jessica's marital property. He also argues that Jessica should then be awarded only a $15,000 credit for the Suburban, "as the Suburban was only sold for $15,000." Brief for appellee at 19.

We agree with the parties that the district court's treatment of the Suburban was an abuse of discretion, as the court appears to have accounted for the vehicle twice in its distribution of the

marital estate characterizing it as both marital and nonmarital property. However, upon our review, we modify the decree of dissolution in a manner different than suggested by either party.

Given that both Mitchell and Jessica agree that the Suburban was purchased with Jessica's premarital funds, and given that the premarital funds utilized in that purchase are easily traceable because the Suburban was not sold until after the parties' separation, we find that the value of the Suburban constituted Jessica's premarital property. However, contrary to her assertion on appeal that she should be credited with the entire purchase price of $18,000, and contrary to the district court's finding that she should be credited with $16,000 as the amount of the purchase price paid in cash, we find that she should only be credited $15,000, as that was the value of the vehicle at the time it was sold. However, Jessica has already received $10,000 in cash from the sale of the Suburban. As such, the Suburban should be treated differently than the other premarital credits awarded to Jessica in the decree. Those credits constitute investments in the marital home which cannot be separated from that marital asset. Because Jessica has sold the Suburban and has already received $10,000 in proceeds, she is only entitled to a $5,000 credit. This is the amount of the sale proceeds which Jessica gave to Mitchell, even though he was not entitled to any of the proceeds from Jessica's premarital property.

We modify the decree of dissolution such that Jessica should receive a $5,000 "[c]redit for premarital funds from sale of [real property] for purchase of 2008 Chevrolet Suburban." We further modify the decree to eliminate the $10,000 in proceeds from the sale of the Suburban which was assigned to Jessica as marital property and to eliminate the $5,000 in proceeds from the sale of the Suburban which was assigned to Mitchell as marital property.

### (b) Valuation and Division of Marital Property

#### (i) Failure to Require Mitchell to Refinance Marital Home

In the decree of dissolution, the district court awarded Mitchell the marital home and the accompanying mortgage. The court valued the home at $156,000 and found the existing mortgage to total $63,318.60. The court did not require Mitchell to refinance the marital home. On appeal, Jessica asserts that the district court erred in failing to require Mitchell to refinance the home because "it completely hamstrings Jessica's ability to move forward from this divorce. Her credit is completely dependent on Mitchell maintaining the mortgage." Brief for appellant at 18-19.

We agree with Jessica that the district court abused its discretion in failing to require Mitchell to refinance the marital home. Although neither party presented specific evidence regarding the terms of the current mortgage, there is documentary evidence which indicates that the loan carries a variable rate and, based upon the amount of principle paid each month, it is a relatively long-term loan. If Mitchell does not refinance the mortgage in order to remove Jessica's name from that debt, her credit could be tied to the marital home and the debt thereon for some years into the future. We modify the decree of dissolution to require Mitchell to refinance the marital home and remove Jessica's name from any debt obligation thereon by July 1, 2020.

#### (ii) Equalization Payment

The district court ordered Mitchell to pay to Jessica an equalization payment in the amount of $50,000. Mitchell was to pay $10,000 to Jessica by the end of 2018, or within approximately

3 months of the decree being entered. The remaining $40,000 was to be paid in four equal annual installments of $10,000 each payable by October 1 of each year. On appeal, Jessica asserts that the district court erred in giving Mitchell such a substantial amount of time to pay her the equalization payment. She argues that the 4-year time period is particularly unreasonable given that the parties were only married for 3 years prior to their separation.

Under the facts and circumstances presented by this case, we cannot say that the district court erred in giving Mitchell 4 years to pay the $50,000 equalization payment. In particular, we note that Mitchell's financial circumstances indicate that he would not be capable of paying the relatively large equalization payment sooner, unless he chose to sell the marital home. Mitchell specifically testified that he wanted to reside in the marital home with Marcus. In providing Mitchell with an extended period of time to pay the equalization payment, the district court appears to be recognizing Mitchell's request to keep the home. We cannot say that the court abused its discretion in establishing the payment plan for the equalization payment due to Jessica.

### (iii) Division of Property

When taking into account the equalization payment Mitchell owed to Jessica, the district court divided the marital estate such that Mitchel received 56 percent of the estate and Jessica received 44 percent of the estate. On appeal, Jessica asserts that this division is unreasonable given that the marriage was of short duration and given that she brought a great deal more assets into the marriage than Mitchell did.

Before we analyze Jessica's assertions on appeal, we must analyze how our modifications to the decree have affected the division of property. Specifically, we reduced Jessica's premarital credit for the Suburban from $16,000 to $5,000. In addition, we eliminated the sale proceeds from the Suburban from both parties' assigned marital assets. In recalculating the net marital estate based upon these changes, we conclude that Mitchell would still have to pay an equalization payment of approximately $49,000 in order for Jessica to receive 44 percent of the marital estate as the district court decided. Given the equities involved in this case and given that the recalculated equalization payment is very close to the payment of $50,000 originally ordered by the district court, we determine that the equalization payment should remain at $50,000. As a result, Jessica is now receiving an amount that is nearly half of the marital estate while Mitchell is receiving slightly more. We find this division of the marital estate to be appropriate when considering all of the evidence regarding the parties' financial circumstances, particularly Jessica's withdrawal of significant marital funds from the parties' joint account at the time of separation and Mitchell's continued contributions to the joint account during the first year of separation after he vacated the marital residence.

### 2. CUSTODY OF MARCUS

On appeal, Jessica challenges the district court's decision to award Mitchell sole physical custody of Marcus. She asserts that the district court failed to explain its rationale for awarding Mitchell physical custody and failed to affirmatively indicate that this custodial arrangement was in Marcus' best interests. In our de novo review of the district court's decision, Jessica urges us to consider evidence that she has been Marcus' primary caregiver since his birth, that awarding

Mitchell physical custody will seriously disrupt Marcus' relationship with her older son, and that Mitchell's testimony lacked credibility. Before we address Jessica's specific assertions, we examine the relevant considerations in decisions about custody.

When custody of a minor child is an issue in a proceeding to dissolve the marriage of the child's parents, child custody is determined by parental fitness and the child's best interests. *Maska v. Maska*, 274 Neb. 629, 742 N.W.2d 492 (2007). When both parents are found to be fit, the inquiry for the court is the best interests of the children. *Id*. Neb. Rev. Stat. § 43-2923 (Reissue 2016) provides:

(6) In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member. . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

In addition to the "best interests" factors listed in § 43-2923, a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

We first discuss Jessica's claims that the district court failed to adequately explain its rationale for awarding sole physical custody of Marcus to Mitchell. First, we note that in the decree, the district court listed the appropriate factors to consider in determining the best interests of Marcus. While the court did not go into detail in its findings with regard to each factor, the court did specifically indicate that it had considered these factors in determining that it would be in Marcus' best interests for Mitchell to have sole physical custody. Jessica has made no reference to statutes or case law which would require the district court to include a detailed rationale in its award of custody. In the absence of a request by a party for specific findings, a trial court is not required to make detailed findings of fact and need only make its findings generally for the prevailing party. *Schroeder v. Schroeder*, 26 Neb. App. 227, 918 N.W.2d 323 (2018). Moreover, given that our review of the district court's decision to award sole physical custody to Mitchell is de novo, we note that we have thoroughly considered all of the evidence presented by both parties during the dissolution proceedings.

Upon our de novo review, we cannot say that the district court abused its discretion in awarding Mitchell sole physical custody of Marcus. The evidence presented during the dissolution proceedings revealed that both Jessica and Mitchell are fit parents. And, both Jessica and Mitchell have a good relationship with Marcus. Jessica asserts in her brief on appeal that she has been Marcus' primary caregiver since his birth. However, Mitchell presented evidence to contradict Jessica's characterization of her role as primary caregiver. Mitchell testified that when he and Jessica were still living together, he was involved with caring for both Marcus and Jessica's older child on a daily basis. Mitchell's mother also testified that when Mitchell and Jessica were still together, she often watched Marcus and Jessica's older child for Jessica multiple times per week while Mitchell was at work. Such evidence challenges Jessica's claims that she played a much bigger role in Marcus' life than Mitchell.

During her trial testimony, Jessica testified that it would be hard on Marcus if Mitchell were awarded physical custody because Marcus was used to being in her care. However, the evidence presented at trial disputed Jessica's claims. From December 2017 through the second day of trial on April 30, 2018, Mitchell had custody of Marcus every other week as a result of the temporary custody arrangement ordered by the court. Both parties testified that during this time, Marcus was a happy and healthy child. He was enrolled in preschool programs near both of his parents' homes and was, by all accounts, thriving. Mitchell testified that having parenting time with Marcus every other week had been "awesome." Jessica did not present any evidence to demonstrate that Marcus struggled during this time period.

Despite the seeming success of the temporary joint custody arrangement, in their trial testimonies, both Mitchell and Jessica sought sole physical custody. Mitchell testified that the joint custody arrangement was no longer feasible given that Marcus is nearing school age and that Mitchell and Jessica live a significant distance apart. Mitchell also indicated that he and Jessica struggle to communicate with another, which would make a long-term joint custody arrangement difficult to implement. Jessica testified that she wanted sole physical custody of Marcus because she had been his primary caretaker and because she has a very strong bond with Marcus. We note that in her brief on appeal, Jessica appears to take the position that the district court should have awarded the parties with joint physical custody given that Marcus "has thrived under the previous custody arrangement." Brief for appellant at 22. Given the parties' request to be awarded sole physical custody and given the other evidence presented at trial concerning the parties' circumstances, we do not find that the district court erred in declining to award joint physical custody.

Evidence presented at trial demonstrated that Mitchell is more capable of providing a stable residence for Marcus than Jessica. Mitchell has lived in Indianola for a majority of his life. He has a stable job with the city and he desires to continue to reside with Marcus in the parties' marital home. He plans to keep Marcus in the same school system where he has attended preschool. In addition, Marcus has a close relationship with Mitchell's extended family in Indianola, including with Mitchell's parents who live nearby.

To the contrary, the evidence revealed that Jessica had moved multiple times during the dissolution proceedings. By the time of the first day of trial in early December 2017, Jessica had moved from Indianola to Cambridge. However, she testified that she was planning to move to

Norfolk to be closer to family. By the time of the second day of trial in April 2018, Jessica no longer had plans to live in Norfolk and instead was residing in Newman Grove in the basement of a church, which she was helping to renovate. She had sold her house in Cambridge. Notably, in the years prior to the parties' marriage, Jessica had also moved numerous times. Jessica does not currently have a job and as a result, she does not have a steady stream of income. Mitchell presented evidence to demonstrate that Jessica has issues controlling her temper and has inappropriately disciplined her older child after becoming upset with him, including slapping, kicking, and hitting the child. There was also evidence that shortly before the second day of trial, Jessica had initiated a physical altercation with Mitchell's mother when Marcus was present.

In her brief on appeal, Jessica points to the detrimental impact the district court's custody decision will have on the relationship between Marcus and her older child. However, had the district court awarded Jessica with sole physical custody of Marcus, his relationship with Mitchell's older child would also be negatively impacted. Similarly, Marcus' relationship with his extended family would be disrupted regardless of whether custody was awarded to Jessica or to Mitchell. Evidence presented at the trial clearly indicated that Marcus has a strong connection with Mitchell's family in Indianola. Marcus sees Mitchell's parents almost every day and has regular contact with his aunts, uncles, and cousins. The evidence regarding Marcus' connection with Jessica's family was more tenuous. There was some indication that Jessica is not close with much of her extended family and that she has, at least at times, had a strained relationship with her father, who she indicated was very close with Marcus.

Mitchell testified at trial that he understands the importance of Marcus and Jessica having a relationship. He affirmed that he would not interfere with their relationship. Mitchell also testified that he was concerned that if Jessica were awarded physical custody, she would interfere with his relationship with Marcus.

Given our reading of the record, we cannot say that the district court abused its discretion in awarding Mitchell sole physical custody of Marcus. Although the court did not make a specific finding regarding witness credibility, given the court's custody decision, it is clear that it found Mitchell to be more credible than Jessica. Taking into account the court's implicit finding of Mitchell's credibility, the evidence at trial demonstrated that while both Mitchell and Jessica love Marcus very much and are greatly involved in his life, Mitchell can provide Marcus with a more stable, secure home life, living in the town he has resided in for much of his life. In Mitchell's custody, Marcus will continue to attend school in the same school system and will continue to have regular contact with his extended family, who he is very close to. We affirm the district court's decision which awarded Mitchell physical custody of Marcus.

## VI. CONCLUSION

We have modified the court's determination of marital property and its valuation of the marital estate as set forth above. In particular, we modify the decree to require Mitchell to refinance the marital home by July 1, 2020. We find that the district court did not abuse its discretion in awarding sole physical custody of Marcus to Mitchell.

AFFIRMED AS MODIFIED.